Giles E. Bullock and Katharine D. Bullock, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

The E. C. Brown Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 38151, 44059, 46392, 55802.    Filed May 18, 1956.

*Frederick Thompson, Esq.*, for the petitioners.
*S. Jarvin Levison, Esq.*, for the respondent.

### OPINION.

KERN, *Judge:* These proceedings were consolidated for hearing and opinion and were submitted upon a stipulation of facts and the exhibits annexed thereto. They are incorporated herein by this reference as our Findings of Fact, and such facts as are necessary to an understanding of the opinion and certain ultimate findings of fact are set forth under the respective issues involved herein.

The individual petitioners, Giles E. Bullock and Katharine D. Bullock, are husband and wife and reside in Rochester, New York. The petitioner, the E. C. Brown Company, is a New York corporation having its principal place of business in the city of Canandaigua, New York. The joint Federal income tax return of the individual petitioners for 1948 and the Federal income tax returns of the corporate petitioner for the years in issue were filed with the collector of internal revenue for the twenty-eighth district of New York.

The Commissioner determined deficiencies in income tax against the petitioners as follows:

| Docket No. | Taxpayer | Year ended | Amount |
| --- | --- | --- | --- |
| 38151 | Giles E. Bullock and Katharine D. Bullock | Dec. 31, 1948 | $136,708.40 |
| 44059 | E. C. Brown Company | Aug. 31, 1947 | 43,220.55 |
| 44059 | E. C. Brown Company | Aug. 31, 1949 | 42,814.73 |
| 46392 | E. C. Brown Company | Aug. 31, 1950 | 3,173.32 |
| 55802 | E. C. Brown Company | Aug. 31, 1951 | 8,843.69 |

By an amendment to his answer in Docket No. 38151, the Commissioner asserted a claim for an increased deficiency therein under section 272 (e) of the Internal Revenue Code of 1939.

The issues for decision are:

(1) Whether for its fiscal year ended August 31, 1947, the E. C. Brown Company was entitled to deductions of $2,326.29 and $112,930.09, respectively, for accelerated depreciation of sprayer machinery and for obsolescence of velocipede machinery.

(2) Whether the exchange on February 9, 1948, by Giles E. Bullock of 352 shares of the capital stock of the E. C. Brown Company owned by him for debenture bonds of Velo-King, Inc., of the face amount of $400,000 was a nontaxable exchange under section 112 of the Internal Revenue Code of 1939 or was a taxable transaction as a dividend under section 115 (g) or as capital gain under sections 111 and 117.

(3) Whether the cancellation or redemption by the E. C. Brown Company during 1948 of 150 shares of its preferred stock owned by the petitioner Katharine D. Bullock and 77 shares of its preferred stock owned by the petitioner Giles E. Bullock for the total amount of $23,835 was essentially equivalent to the distribution of a taxable dividend under section 115 (g).

(4) Whether for its fiscal year ended August 31, 1949, the E. C. Brown Company was entitled to a deduction of $116,373.92 for the partial worthlessness of a debt due from Velo-King, Inc.

(5) Whether for its fiscal year ended August 31, 1950, the E. C. Brown Company was entitled to a deduction of $12,419.45 for the partial worthlessness of a debt due from Velo-King, Inc., and, if entitled to a deduction, whether the same was a capital loss rather than a bad debt.

(6) Whether for its fiscal year ended August 31, 1951, the E. C. Brown Company was entitled to a deduction of $38,256.78 for a bad debt due from Velo-King, Inc., or whether such loss was a capital loss.

## *Depreciation.*

Prior to World War II, the E. C. Brown Company (hereinafter referred to as the company) was engaged in the manufacture and sale of agricultural sprayers and velocipedes. At that time it depreciated its sprayer machinery and its velocipede machinery on the basis of an 8 months' use and a 4 months' use, respectively. After the war, it manufactured and sold only the sprayers and it leased its velocipede machinery and equipment and other property to Monroe Ordnance, Inc. (hereinafter referred to as Monroe), which was wholly owned by Colin Brown and Giles E. Bullock. During the fiscal year ended August 31, 1947, the company used its sprayer machinery and Monroe used the leased velocipede machinery on double shifts for 12 months.

The company has used the following depreciation rates on its sprayer equipment:

| | Prior to 1941 Per cent | Decreased Aug. 31, 1941 Per cent | Increased Aug. 31, 1946 Per cent |
|---|---|---|---|
| Machinery | 10 to | 6⅔ to | 10 |
| Tools and utensils | 22½ to | 15 to | 22½ |
| Patterns and tracings | 30 to | 20 to | 30 |
| Plating equipment | 15 to | 10 to | 15 |
| Factory fixtures | 15 to | 10 to | 15 |

The 50 per cent increase in depreciation rates for the fiscal year ended August 31, 1947, was explained on the company's income tax return for that year as being due to its operations being carried on by double shifts resulting in an increased use of its depreciable assets.

On August 12, 1946, there was presented to a meeting of the board of directors of the company a report by Giles E. Bullock, its secretary-treasurer, on a study made by him of the depreciation problem in connection with the velocipede machinery leased to Monroe. He stated therein that it was the judgment of the management that this machinery would be obsolete at the conclusion of the lease period on January 31, 1947, and recommended that the difference between the original cost of each machine and its estimated value as of January 31, 1947, be charged off as depreciation in equal monthly installments over the period remaining until that date after which time any machinery not sold would be subject to the company's normal depreciation schedule. The board of directors ratified the report, declared it to be the policy of the company, and directed the officers to carry out the recommendations.

The company realized income of $286,557.85 from the rental of its velocipede machinery to Monroe in 1946 and 1947, and reported such income for tax purposes.

On August 31, 1947, the company transferred the velocipede machinery to a newly formed corporation, Velo-King, Inc. (hereinafter referred to as Velo-King), in a transaction more fully set forth, *infra*, under the issue on reorganization. The machinery and equipment and certain tools transferred at the same time had adjusted bases of $75,530.05 and $2,625.94, respectively. Velo-King immediately appreciated these assets by $448,696.12 and $72,843.33, respectively, as a result of appraisals prepared by a recognized firm of industrial appraisers. Velo-King later went into bankruptcy and on June 27 and 28, 1950, its assets were sold at public auction. Machinery and other personal property having an adjusted basis of $254,223.23, according to the corporation's books, were sold for $167,500. Included among these assets was equipment acquired from the company which had an adjusted basis of $72,285.47.

The company's average annual sales, depreciation charges, and maintenance costs for the period September 1, 1931, to August 31, 1941, and for the year ended August 31, 1947, were as follows:

| Average | Sprayer sales | Velocipede sales | Total sales | Depreciation taken | Machinery maintenance |
|---|---|---|---|---|---|
| 1931–41 | $350, 625 | $134, 944 | $485, 469 | $18, 598 | $8, 668 |
| 1947 | 1, 542, 855 | 2, 505, 617 | 4, 048, 472 | [1] 134, 695 | 116, 954 |

[1] $10,648, sprayer; $124,047, velocipede; Total, $134,695.

The Commissioner disallowed $2,326.29 of a deduction claimed in the amount of $6,284.20 for depreciation for the fiscal year ended August 31, 1947, on the company's sprayer machinery on the ground that no basis had been established for the allowance of an accelerated rate. The Commissioner also disallowed for that year $112,930.09 of depreciation claimed in the amount of $124,047.36 on the velocipede machinery on the ground that the depreciation thereon had to be spread over the useful life of the assets.

The company contends that it was entitled to depreciate its sprayer machinery during its fiscal year ended August 31, 1947, under the straight-line method at a rate 50 per cent higher than the rate of depreciation it had used since 1941 on the ground that the increase was justified by the greater wear and tear resulting from the increased usage of the machinery. It takes the position that this is not really a case of "accelerated depreciation" since it had voluntarily reduced the rate of depreciation by one-third in 1941 when the machinery was being used only 8 months of the year and that the "increase" was, therefore, only the restoration of the "normal" rate.

The fact remains that for 6 years the company had used, and the Commissioner apparently had accepted, a certain rate of depreciation on the sprayer machinery and the company now seeks to increase this rate. In order to do so, it must establish the reasonableness of the new rate by showing through testimony based upon a physical examination of the machinery that increased use and other factors not accounted for in the old rate have, in fact, materially reduced the machinery's useful life. Evidence of increased usage alone is insufficient, since the rate of depreciation under the straight-line method is not necessarily proportionate to the use to which the depreciable asset is being put. Evidence of increased repairs is also insufficient, since they may be due to inflated costs and may, in fact, have resulted in retarding the exhaustion of the equipment. *Copifyer Lithograph Corporation*, 12 T. C. 728; *H. E. Harman Coal Corporation*, 16 T. C. 787, affirmed on this issue (C. A. 4, 1952) 200 F. 2d 415. The company has conceded that no proof has been adduced either as to the condition of the sprayer machinery at the beginning and the end of the year in issue or as to the effect of the increased usage upon such machinery.

The omission of this proof is decisive, and we sustain the Commissioner on this point.

The company has also failed to show that the Commissioner was in error·in disallowing depreciation taken in the amount of $112,930.09 on the velocipede machinery leased to Monroe. The claim for this deduction is predicated on the factor of obsolescence and does not involve the question of accelerated depreciation due to increased usage.

Section 23 (1) of the Internal Revenue Code of 1939 authorizes a reasonable allowance for obsolescence as part of the deduction for depreciation. The conditions under which the allowance for obsolescence may be availed of are set forth in Regulations 111, section 29.23 (1)–6, reproduced in the margin hereof.[1] Whether or not property belonging to the taxpayer has sustained obsolescence is a question of fact to be determined from the evidence in each case, *Conley Tin Foil Corporation*, 17 B. T. A. 65. The burden is upon the taxpayer to furnish evidence to show that the useful life of the property has been shortened by obsolescence and that its cost will not be recovered by the deduction for depreciation for ordinary wear and tear before its usefulness is at an end. *Southeastern Bldg. Corp.* v. *Commissioner*, (C. A. 5, 1945) 148 F. 2d 879, certiorari denied 326 U. S. 740. Thus, the taxpayer has the burden of proving that the property is becoming obsolete and when it will be obsolete. *Detroit & Windsor Ferry Co.* v. *Woodworth*, (C. A. 6, 1940) 115 F. 2d 795, certiorari denied 312 U. S. 692.

There is no evidence in the record before us that during the year in issue the velocipede machinery was "being affected by economic conditions that [would] result in its being abandoned at a future date prior to the end of its normal useful life" and before its cost basis had been recovered by normal depreciation deductions alone. Regs. 111, sec. 29.23 (1)–6. The exhibit containing the report of G. E. Bullock to the August 12, 1946, meeting of the board of directors of the company, which report recommended that the machinery be written off as obsolete over the remaining period for which it was leased, and the exhibit containing the report of the company to the collector of internal revenue in support of the depreciation deduc-

---

[1] SEC. 29.23 (1)–6. OBSOLESCENCE.—With respect to physical property the whole or any portion of which is clearly shown by the taxpayer as being affected by economic conditions that will result in its being abandoned at a future date prior to the end of its normal useful life, so that depreciation deductions alone are insufficient to return the cost or other basis at the end of its economic term of usefulness, a reasonable deduction for obsolescence, in addition to depreciation, may be allowed in accordance with the facts obtaining with respect to each item of property concerning which a claim for obsolescence is made. No deduction for obsolescence will be permitted merely because, in the opinion of a taxpayer, the property may become obsolete at some later date. This allowance will be confined to such portion of the property on which obsolescence is definitely shown to be sustained and cannot be held applicable to an entire property unless all portions thereof are affected by the conditions to which obsolescence is found to be due.

tions claimed by the company on its return for its fiscal year ended August 31, 1946, were both received in evidence pursuant to the stipulation that they were for the purpose of showing that such reports had been made and were not to be taken as evidence of the facts stated therein. The most that can be determined in the company's favor from the evidence is that its management believed that the velocipede machinery would lose its economic usefulness by January 31, 1947.

On the other hand, it has been stipulated that immediately upon the transfer of the machinery in question to Velo-King on August 31, 1947, its book value was increased by approximately $450,000 pursuant to an appraisal by a reputable firm. We do not know the basis for this action, but it obviously refutes the judgment of the company's officers that the economic usefulness of the machinery was at an end.

The company having failed to establish that a state of obsolescence had set in with respect to the velocipede machinery, the Commissioner's denial of the deduction therefor is sustained. *W. B. Davis & Son, Inc.*, 5 T. C. 1195; cf. *Terminal Realty Corporation*, 32 B. T. A. 623.

### Reorganization.

After the close of World War II the company found that all of its plant facilities and personnel were required for the production of agricultural sprayers for which there was an increased demand. It therefore leased its velocipede machinery and equipment to Monroe, which in turn rented a building at 10 Chapin Street, Canandaigua, New York, from Spencerport Ordnance, Inc., a corporation also wholly owned by Colin Brown and Giles E. Bullock and referred to hereinafter as Spencerport.

Late in 1946 the controlling stockholders of all three corporations, the company, Monroe, and Spencerport, determined that a new corporation should be formed and the velocipede machinery, equipment, and inventory transferred to it. The new corporation, Velo-King, Inc., was organized in April 1947.

On January 31, 1948, and for several years prior thereto the stock of the company was held by the following persons:

| Name | Shares |
|---|---|
| Colin Brown | 375 common |
| Alice G. Brown | 265 preferred |
| G. E. Bullock | 372 common |
| Katharine D. Bullock | 151 preferred |
| R. J. Earley | 1 common |
| Total | 1,164 |

The authorized capital stock of the company after 1931 consisted of 750 shares of $100-par-value common stock and 750 shares of $100-par-value 7 per cent cumulative nonparticipating preferred stock. The terms of the preferred stock provided that up to 5 per cent of the largest amount in par value of such stock which had ever been issued was to be redeemed or repurchased annually out of the net profits remaining after the payment of dividends on the preferred. The holders of the preferred and common stock each had one vote for every share of stock owned, but the preferred could not participate with the common in any dividends in excess of the cumulative dividends to which it was entitled. The preferred stock was preferred over the common as to both earnings and assets, and in the event of any liquidation, or any reduction in its capital resulting in a distribution of any of its assets to its stockholders, the holders of the preferred stock were entitled to receive $105 per share plus an amount equal to all cumulative dividends accrued or in arrears to the date of the liquidation before any distribution of the assets was to be made to the holders of the common stock. No dividend could be declared or paid upon the common stock while the surplus of the company was less than $225,000, nor could any such dividend be declared or paid which would reduce the surplus to less than $225,000 while any of the preferred stock was outstanding.

Pursuant to a plan of reorganization adopted on April 28, 1947, and not here in issue, Brown and Bullock transferred all of their capital stock in Spencerport Ordnance, Inc., to Velo-King in exchange for all of the capital stock (except certain qualifying shares) of the latter. Spencerport was completely liquidated by June 30, 1947, by a transfer of all of its assets and liabilities to Velo-King. Among the assets conveyed were land transferred at a basis of $5,000 and a building transferred at a basis of $64,000.

As of January 31, 1948, the stockholders of Velo-King were:

| Name | Shares |
|---|---|
| Colin Brown | 493 |
| G. E. Bullock | 493 |
| Others | 3 |

The stockholders of the company and of Velo-King adopted a plan of reorganization of the company on April 28, 1947. This plan provided that all of the velocipede machinery, equipment, and inventories of the company were to be transferred to Velo-King solely in exchange for securities of the latter, and that these securities would in turn be distributed to the stockholders of the company in exchange for a portion of their capital stock which would then be canceled. It was stated in the plan that after the war it had become evident that

it would be necessary for the company to divorce itself permanently from the manufacture of velocipedes in order to devote its plant exclusively to the production of agricultural sprayers. The purpose of the plan was (a) to achieve a reduction in the capitalization of the company by the redemption of a portion of its capital stock representing the velocipede assets which it no longer wished to operate itself or to lease to others, and (b) to increase the capitalization of Velo-King through the issuance of its securities in exchange for the velocipede assets which would actually be used by it in the manufacture of its products.

The stockholders of the company at a meeting on April 28, 1947, voted to accept the promissory notes of Velo-King in amounts not less than the residual value of the velocipede machinery and equipment transferred to the latter as evidence of its indebtedness to the company pending the later determination of the total value of the machinery and equipment and the issuance thereof by Velo-King of its debenture bonds.

On May 1, 1947, the company, pursuant to the plan of reorganization, transferred to Velo-King raw materials and goods in process of $152,694.29. This amount was set up as an account payable by Velo-King on its books as of May 31, 1947. On August 31, 1947, the company, pursuant to the plan of reorganization, transferred to Velo-King tools, machinery, and equipment and certain intangibles (listed at $2), in the amount of $86,759.47. Of this amount, machinery and equipment constituted $75,530.05 and tools constituted $2,625.94. The original cost of all of the assets transferred on August 31, 1947, was $244,801.39 and, as of that date, the company had claimed depreciation and obsolescence of $158,043.92. For the fiscal year ended August 31, 1947, the company had claimed depreciation and obsolescence of $124,047.36, of which amount the respondent disallowed $112,930.09.

Upon receipt of the tools, machinery, and equipment on August 31, 1947, Velo-King set up a notes payable account of $75,000, and an accounts payable account of $11,759.47. On August 31, 1947, Velo-King issued its promissory notes in the amount of $225,000 to the company, representing the book value of the inventories, machinery, and equipment previously transferred, and also recorded accounts payable of $11,757.47 and $2,694.29, the sum of which ($14,451.76) represented the difference (less the $2 for intangibles) in the basis of the assets, as claimed by the company, transferred to Velo-King and the face amounts of the notes. The accounts payable were paid to the company on September 30, 1947.

On August 31, 1947, Velo-King appreciated by $883,557.09 the assets acquired from the company and Spencerport as a result of ap-

praisals prepared by a recognized firm of industrial appraisers. The following journal entry was made by Velo-King on that date to record such appreciation:

*Voucher No. 80*

| | |
|---|---:|
| Land | $27, 327. 87 |
| Leasehold improvements | 2, 083. 00 |
| Building | 285, 346. 37 |
| Railroad siding | 2, 131. 71 |
| Machinery and equipment | 448, 696. 12 |
| Tools | 72, 843. 33 |
| Factory fixtures | 35, 018. 20 |
| Office fixtures | 7, 504. 21 |
| Automobiles | 2, 608. 28 |
| Appreciated surplus | $883, 557. 09 |

To record appreciation on Velo-King properties located at Canandaigua, New York, to sound values per appraisal report of October 1, 1946, and additions thereto on March 1, 1947, and August 31, 1947.

The appreciation attributed to Velo-King's building, recorded above at $285,346.37, should have been $215,511.39. The additional amount represented appreciation attributable to buildings owned by the company and merely leased by Velo-King. The appreciation resulted in an increase of the book value of Velo-King's assets from $160,959.40 to $974,681.51 as of August 31, 1947 (after allowance for the correction in the valuation of the buildings).

On January 5, 1948, the issuance of $400,000 of debenture bonds of Velo-King in exchange for the $225,000 of its promissory notes previously issued in partial payment for the velocipede inventory, tools, machinery, and equipment, and the cancellation of these notes was authorized by the boards of directors of the company and of Velo-King. The boards of directors of both corporations agreed that the $400,000 face amount of the debenture bonds represented the market value of the velocipede assets previously transferred by the company.

The debenture bonds were issued to the company on January 31, 1948, and recorded on its books as a payment of notes receivable to the extent of $225,000, and to the extent of $175,000 as "non-taxable gain arising as part of the Plan of Reorganization upon transfer of fixed assets and inventory to Velo-King, Inc. at book value instead of the appraised or market value." The bonds were 10-year 5 per cent debenture bonds on which interest was payable quarterly. The bond certificate provided, in part:

The Corporation promises and agrees to redeem said bonds by paying to the registered holders the principal amount thereof, together with accrued interest, at the rate of one-tenth of the total bond issue, both in number and amount, each year from and after the date of issuance, said bonds to be redeemed consecutively in the order of their serial enumeration. The Corporation shall also have the privilege of redeeming all or any part of said bond issue on any interest-paying date.

On February 3, 1948, Bullock purchased the 375 shares of common stock of the company owned by Colin Brown and the 265 of its preferred stock owned by Alice G. Brown. On that date the stockholders of the company were as follows:

| Name | Common shares | Preferred shares |
| --- | --- | --- |
| Giles Bullock | 747 | 265 |
| Katharine Bullock | --- | 151 |
| Others | --- | 3 |

At a meeting of the stockholders of the company held on February 9, 1948, the following resolutions were adopted:

RESOLVED, that this Company distribute and transfer to the holders of its common stock, pursuant to the plan of reorganization adopted on April 28, 1947, a total of 400 debenture bonds heretofore issued by Velo-King, Inc. in denominations of $1,000.00 each, and now held by this Company, in exchange for outstanding common stock of the Company having a substantially equivalent value; and it is further

RESOLVED, that the officers of this Company be, and hereby are, authorized and directed to distribute and transfer said debenture bonds pro rata to the common stockholders of record, as of the date of this meeting, and to accept in exchange therefor a total of 352 shares of the outstanding common stock of the Company, at a stipulated exchange rate of $1,136.36 per share; and it is further

RESOLVED, that the officers of this Company be, and hereby are, authorized and directed to execute and file with the Secretary of State, on behalf, of the Company, a certificate of reduction of capital stock and of number of shares, reducing the authorized capital stock of this Company to $114,800.00 and reducing the number of shares of common stock which the Company may henceforth have to 398.

According to the minutes of the above meeting, prior to the adoption of the foregoing resolutions, the chairman stated that the plan of reorganization called for the distribution of the $400,000 of debenture bonds received from Velo-King in exchange for the velocipede assets to the stockholders of the company in exchange for its capital stock of equivalent value and further called for a reduction in the recapitalization of the company by the amount of the capital stock so retired in order to bring the total capitalization of the company into accord with the reduced scope of its operations and the reduced value of its capital assets. A balance sheet dated December 31, 1947, showing the book value of the outstanding common stock to be $1,202.09 per share, was submitted to the meeting. The treasurer stated that it was not feasible to retire any of the preferred stock inasmuch as the company had the option of redeeming that class of stock at a stipulated price of $105 per share. The stockholders favored a retirement price of approximately $1,136 per share for the common stock to provide a reasonable allowance for contingencies.

Bullock transferred 352 shares of his common stock to the company in exchange for the $400,000 of debenture bonds as of February 9, 1948. These shares had been acquired by him on April 29, 1929, at a cost of $52,299.64.

Pursuant to the plan of reorganization, the company filed with the secretary of state of the State of New York on April 2, 1948, its certificate reducing its capitalization by $35,200 and the authorized number of shares of its capital stock by 352. The plan of reorganization of the company, together with other pertinent data required by the applicable regulations, was duly filed with the collector of internal revenue for the twenty-eighth district of New York by all of the parties to the transaction as part of their returns for the taxable year in which the transaction occurred.

On February 10, 1948, Velo-King, pursuant to the authorization of its board of directors, purchased the 493 shares of no-par-value common stock owned by Colin Brown for $75,000. These shares had originally been issued to Brown at a value of $30 per share in exchange for his common stock in Spencerport. After February 10, 1948, Bullock owned all of the capital stock of Velo-King with the exception of qualifying shares.

It is contended on behalf of the petitioner, Giles E. Bullock, that under the provisions of section 112 of the Internal Revenue Code of 1939 the foregoing transactions, except for the payment of cash to the company and the sale by the Browns of their stock in the company and in Velo-King, were parts of a reorganization plan and their performance constituted a tax-free reorganization involving the company and Velo-King, and that, consequently, no gain was recognizable to Bullock upon his receipt of the debenture bonds in exchange for a portion of his common stock in the company. The purpose of the transaction, according to Bullock, was to accomplish a reduction in the capitalization of the company by a cancellation of a portion of its common stock representing the velocipede machinery and related assets, which it no longer desired either to operate or to lease to others, and to increase the capitalization of Velo-King, which was to acquire these assets in exchange for its bonds and to use them in its own business. It is argued that the transfer of these assets under the circumstances set forth above amounted to a reorganization within the meaning of section 112 (g) (1) (D), the gain or loss from which to the company was not recognizable under section 112 (b) (4). The exchange of the bonds for a portion of Bullock's stock in the company is claimed to be exempt from tax under the provisions of section 112 (b) (3). The tax liability of the company with respect to this transaction is not in issue and the petitioners argue that even if there was a technical failure to comply with the provisions of section 112 (b) (4), due to the cash payment of $14,451.76 by Velo-King to the company, this would not affect the question of the nonrecognition of the gain or loss to Bullock upon the receipt of the bonds. See sec. 112 (d). It is argued in the alternative that if a tax-free reorganization did not occur, then the

redemption of a portion of Bullock's stock in exchange for the debenture bonds amounted to no more than a partial liquidation under section 115 (c).

The Commissioner contends that a tax-free reorganization was not effected by the above transaction, and that Bullock received a taxable dividend under the provisions of section 115 (g) upon the distribution to him of the Velo-King debenture bonds. In his deficiency notice the Commissioner determined the amount of the dividend to be $189,800, but by amendment to his answer he affirmatively pleaded that the amount of the dividends was actually $400,000, the face amount of the bonds. In the alternative, the Commissioner contends that Bullock realized a capital gain of $347,700.36, which was the difference between the face amount of the bonds and the cost basis of $52,299.64 to Bullock of the shares of common stock surrendered in exchange for the bonds.

The Commissioner bases his arguments that a tax-free reorganization did not take place upon the following points:

1. The reorganization in question does not constitute a statutory reorganization within the meaning of section 112 (g) (1) (D).

2. The plan of reorganization as adopted was not effectuated and, therefore, the reorganization was not "pursuant to the plan" as required by section 112 (b)(3) or (4).

3. The Velo-King debenture bonds do not qualify as "securities" within the meaning of section 112 (b)(3).

The plan of reorganization of the company was in the form of a carefully drawn memorandum evidently prepared by competent counsel. It stressed the dual purpose of the plan, that is, (a) the transfer of the so-called velocipede assets to Velo-King in return for the latter's securities and (b) the transfer of those securities to the company's stockholders in return for a surrender of part of their stock in the company with a consequent reduction in the company's capital. To give two examples, the plan states: "This step [the transfer of "Velo-King securities to the Brown stockholders for a proportionate amount of their stock"] is an essential and integral part of the whole reorganization plan; without it, there is very little, if anything, to be gained from the reorganization." And again it states:

It is obvious that the issuance or distribution of the Velo-King bonds to Brown's stockholders in exchange for part of their stock in either Brown or Velo-King is essential to the purpose in view, i. e.: the reduction in Brown's capitalization to accord with the reduction in its assets. Therefore, what we have here is a single unified transaction consisting of several steps rather than a series of separate transactions, and, in the light of the foregoing discussion, the several steps must be taken together as constituting the reorganization plan.

This "unified transaction consisting of several steps," outlined by the reorganization plan, was accomplished on February 9, 1948, when the company transferred to Bullock the Velo-King debentures in

return for 352 shares of the company's common stock. Since respondent has assumed this date to be February 29 instead of February 9, we quote from the two pertinent paragraphs of the stipulation of facts on this point. In paragraph 35 it is stipulated: "The minutes of the stockholders meeting of the E. C. Brown Company, held on February 9, 1948, show the following," after which appear the minutes of the meeting leading up to and including the resolutions adopted authorizing the officers of the company "to distribute and transfer said debenture bonds pro rata to the common stockholders of record, as of the date of this meeting, and to accept in exchange therefor * * * 352 shares of the * * * common stock of the company * * *," and this paragraph of the stipulation further reads: "Giles Bullock transferred 352 shares of the common stock of the E. C. Brown Company to the company in exchange for the $400,000 of debenture bonds." Paragraph 38 of the stipulation reads:

The E. C. Brown Company made the following journal entry recording the transfer of debenture bonds in exchange for the 352 shares of its common stock:

*Journal Voucher No. 3803*

Common stock_____ $35,200.00
Unearned Surplus_____ 175,000.00
Surplus _____ 189,800.00
    Debenture Bonds_____ $400,000.00
To record liquidation of part of Company assets of February 9, 1948, in accordance with reorganization plan adopted by Board of Directors at meeting held 2-9-48.

We have found no reference to the date February 29, in the stipulation. The plain implication of the paragraphs of the stipulation, which we have set out above, is that the transaction involving the exchange of debentures for the common stock of the company was substantially completed on February 9.

The latter date is important because it was not until the following day, February 10, that Velo-King purchased the 493 shares of its stock owned by Brown. As of February 9, when we consider the plan of reorganization was accomplished, Bullock owned all of the common stock and he and his wife practically all of the preferred stock of the company, with the Browns owning none, while Bullock and Brown each owned 493 shares of the stock of Velo-King, with 3 other shares outstanding. Thus, on February 9, the stockholders of the company (the Bullocks) were not in control of Velo-King, Brown held no stock in the company, and the stockholdings of Bullock and Brown in the two corporations were not those contemplated in the plan of reorganization.

The plan refers to the formation of Velo-King by "the principal stockholders of Brown"; it points out that the proposed reorganization is a "transaction between the two corporations and the stockholders

common to both"; it states that after the completion of the reorganization, "the other parties in interest, the stockholders of both Brown and Velo-King, will be in the same relative position as before"; and it warns that in order to ensure the necessary "continuity of interest," the Velo-King securities "should go to the same stockholders who surrender their stock *and in substantially the same proportions.*" (Emphasis supplied.)

The plan of reorganization also contains the following significant paragraph:

One final caveat: The foregoing report has been predicated upon the particular facts described and therefore cannot be read on any variation of those facts, however slight, or on any different set of facts. The sections of the Internal Revenue Code exempting certain transactions from taxable gain or loss are precise in their definitions, and, being in the nature of particular exemptions from a general tax, are construed most strictly against the taxpayer. For that reason, any variation in the essential details of the proposed reorganization will necessitate a re-examination of the whole transaction and a redetermination of its taxability in the light of the changes made.

We assume *arguendo* that petitioners are correct in their contention that the elimination of the Browns' interest in the company and, later, in Velo-King "was not contemplated in the plan of reorganization * * *." However, the elimination of the Brown's interest in the company occurred during the reorganization ("a unified transaction consisting of several steps"), not subsequent to the transactions contemplated by the plan. Cf. *Robert Campbell*, 15 T. C. 312. And, if it "was not contemplated in the plan of reorganization," it was such a material deviation from the plan that it is impossible to say that the transfer of the Velo-King debentures on February 9 to Bullock alone was pursuant to the plan of reorganization. As we have pointed out, that plan contemplated that at least until the reorganization was completed the stockholders of both Brown and Velo-King should be in the same relative position as before the reorganization, i. e., in control of both corporations, and that the securities of Velo-King should be transferred to them in the same proportions. Contrary to the plan (still assuming petitioners correct in their contention stated), the completion of the reorganization found the Browns completely eliminated from the company which was now entirely owned by the Bullocks and the Bullocks, who were now in control of the company, not in control of Velo-King, with the Velo-King securities being distributed only to Bullock in return for his surrender of a part of his common stock in the company.

If the elimination of the Browns as stockholders of the company is considered as contemplated in the plan of reorganization and an essential part of the plan as carried out, then there was a fatal lack of continuity of interest in Velo-King, Inc. *Weicker* v. *Howbert*, 103

F. 2d 105. If it was not contemplated in the plan, then their elimination as stockholders of the company prior to the completion of the reorganization was such a material deviation from the plan that we must conclude that the exchange of the Velo-King securities for Bullock's common stock in the company was not "in pursuance of the plan of reorganization."

While respondent, in our opinion, is mistaken as to the time when the reorganization was completed, we conclude, for the reasons stated, that he is correct in his contention that recognition of any gain arising from the exchange of the Velo-King debentures for the surrender of Bullock's common stock of the company is not precluded by any provision of section 112 (b). We therefore consider it unnecessary to consider other arguments advanced by respondent on this point.

Petitioners' principal contention on this issue is that the reorganization here in question is a "split-off" similar to that considered by us in *Chester E. Spangler*, 18 T. C. 976, and should be held to be a nontaxable reorganization on the authority of that case and *Riddlesbarger* v. *Commissioner*, 200 F. 2d 165. It might be that if there had not been material deviation from the plan of reorganization, which was carefully prepared by counsel and presented to the Browns and Bullocks, a nontaxable reorganization of the "split-off" type would have resulted, but as we have pointed out, that is not the case before us.

Since the distribution of the Velo-King debentures in exchange for 352 shares of Bullock's common stock in the company failed to qualify under the nonrecognition provisions of section 112 (b), the next question to be considered is whether the transaction constituted a partial liquidation under sections 115 (c) and (i),[2] or a taxable dividend under section 115 (g).[3]

---

[2] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(c) DISTRIBUTION IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. In the case of amounts distributed (whether before January 1, 1939, or on or after such date) in partial liquidation (other than a distribution to which the provisions of subsection (h) of this section are applicable) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits. * * *

\*　　\*　　\*　　\*　　\*　　\*　　\*

(i) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

[3] (g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

There is no general rule as to when a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend under section 115 (g), and the determination depends upon the circumstances in each case. Regs. 111, sec. 29.115–9; *Jones* v. *Griffin*, (C. A. 10, 1954) 216 F. 2d 885. Certain recognized criteria have been developed by the courts and include the following: The presence or absence of a real business purpose; whether the action was initiated by the corporation or by the shareholders; the amount of earnings and profits available for the declaration of a regular dividend, and the corporation's past record with respect to the payment of dividends; whether the distribution resulted in any substantial change in ownership and control, or in a contraction of corporate operations; continued profitable operations; the effect of the distribution as compared with the declaration of a regular dividend; any special circumstances existing at the time of a distribution; *Jones* v. *Griffin*, *supra*; *Joseph W. Imler*, 11 T. C. 836. No one factor is controlling and all relevant factors must be considered. *J. Paul McDaniel*, 25 T. C. 276.

Some of the factors outlined above support the respondent's contentions on this point and others support petitioner. After considering all the pertinent factors in the light of the entire record herein, it is our conclusion that the distribution of the Velo-King debentures in exchange for 352 shares of Bullock's common stock in the company constituted a partial liquidation under section 115 (c) and (i); and that the Commissioner was in error in determining that the distribution to him of the Velo-King debentures in exchange for a portion of his common stock of the company was essentially equivalent to the distribution of a taxable dividend within the meaning of section 115 (g).

The final question to be determined on the taxability of the transaction to Bullock is the fair market value on February 9, 1948, of the debenture bonds distributed to him.

The Commissioner, in his deficiency notice to Bullock, determined that he had received a taxable dividend of $189,800 upon the distribution to him of the Velo-King debentures, and hence necessarily determined that the debentures had a fair market value of at least that amount.

The petitioner Bullock contends that the debentures had a fair market value of zero when distributed and the burden is upon him to prove that they had a value less than that determined by the Commissioner in the deficiency notice. By an amendment to his answer, the Commissioner alleged that Bullock had received a dividend in the amount of $400,000 which he asserted to be the fair market value of the bonds. The burden, therefore, is upon the Commissioner to

prove that the debentures did have a fair market value in excess of $189,800.

None of the debentures was ever sold and the determination of their fair market value must be by reference to the value of the underlying assets of Velo-King and its earning potential. Neither party offered any opinion evidence by qualified experts in the appraisal of this type of security.

It seems apparent from the record before us that the petitioner Bullock, as one of the principals involved in the exchange between the company and Velo-King, was of the opinion that the bonds were worth at least par when received by him on February 9, 1948. The assets acquired by Velo-King from the company and Spencerport were appraised by a reputable firm of industrial appraisers as of August 31, 1947, at a value approximately $800,000 in excess of their book values, and the books of the corporation were adjusted to reflect the increased value. It has been stipulated that the boards of directors of both Velo-King and the company agreed that the $400,000 in debenture bonds represented the market value of the velocipede machinery and related assets. A statement to the same effect was incorporated in the corporation's Federal income tax return. Bullock acquiesced in Brown's sale on February 10, 1948, of his 493 shares of Velo-King capital stock to the corporation for $75,000, although these shares had been issued at a total stated value of $14,790 on April 24, 1947. It does not appear probable that Bullock would have permitted this withdrawal of funds unless he believed that there was substantial value in the corporation. The corporation's balance sheet as of February 29, 1948, shows current assets alone of over $600,000, or considerably more than enough to meet the corporation's liabilities to outside interests of approximately $337,000 ($912,000 total liabilities less $400,000 in bonds and $175,000 in notes to the company), and yet leave assets of well over $1,000,000 to meet the obligations to Bullock and the company totaling $575,000.

However, the balance sheet does not tell the entire story and we have carefully considered additional factors, such as the fact that the debentures were not secured other than by the general assets of the corporation, that the corporation was new and had no considerable earnings history, such as it did have being poor, and that its earning capacity was uncertain due to the speculative nature of the business. After giving careful consideration to all of the foregoing factors, it is our conclusion that the fair market value of the debenture bonds of Velo-King, at the time of their transfer to Bullock, was $300,000.

### Preferred Stock Redemption.

The preferred stock of the company was originally issued in 1931 to raise funds for the purchase of the assets of another corporation.

In 1942, 300 shares of the preferred stock were transferred by one of the original holders to Colin Brown and Giles Bullock equally. In 1943, Colin Brown transferred his 150 shares to his wife, Alice, who had previously acquired 115 shares in 1932, and Giles Bullock transferred his 150 shares to his wife, Katharine. The only redemption of preferred stock that occurred prior to those in issue herein was in 1943 when 335 shares were redeemed from another stockholder, not here involved, who had held them since November 1940.

The terms of the preferred stock have already been set forth, *supra*, page 283, and need not be repeated here except that it should be noted that such terms specifically provided for the annual redemption of a portion of the preferred stock out of net profits or surplus, and for the redemption of the preferred stock at $105 per share plus dividends accrued or in arrears in the event of any reduction in capital resulting in a distribution of any assets to the shareholders.

On May 3, 1948, the chairman informed a meeting of the board of directors that the company was in arrears in the retirement of its preferred stock according to the terms of the stock issue, and thereupon resolutions were adopted authorizing and directing the retirement of 100 of the 150 shares of preferred stock then held by Katharine Bullock at the price and in accordance with the terms of the stock issue. At a meeting of the board of directors on July 6, 1948, the treasurer reported that the company was still in arrears in the retirement of its preferred stock and was then in a sufficiently liquid position to retire the remaining 50 shares held by Katharine Bullock and 77 of the 265 shares held by Giles E. Bullock. He informed the meeting that the retirement of this number of shares would bring the company up to date in the retirement of its preferred stock. A resolution was adopted directing that 50 shares of preferred stock be redeemed from Katharine Bullock and 77 from Giles E. Bullock.

Pursuant to these authorizations, the company retired preferred stock on the following dates and for the following amounts:

| | | |
|---|---|---|
| May 25, 1948_____ | 100 shares_____ | Owned by Katharine Bullock for $10,500. |
| July 23, 1948_____ | 77 shares_____ | Owned by Giles Bullock for $8,085. |
| July 24, 1948_____ | 50 shares_____ | Owned by Katharine Bullock for $5,250. |

With the redemption of 50 shares on July 24, 1948, Katharine Bullock ceased to be a stockholder in the company.

By amendment to his answer, the respondent alleged that the foregoing redemptions of the preferred stock from Katharine and G. E. Bullock constituted a dividend within the meaning of section 115 (g). The respondent has the burden of proving the applicability of that

section to these transactions since this claim constitutes new matter.

As we have previously said, whether a distribution in connection with a redemption of corporate stock is essentially equivalent to the distribution of a taxable dividend depends on the circumstances of each case, Regulations 111, section 29.115–9, and all relevant factors must be considered. One important factor to be inquired into is the possible existence of some legitimate business or "corporate purpose as distinguished from a purpose to benefit the stockholder by a distribution of earnings and profits exempt from the imposition of income tax." See *Keefe* v. *Cote*, (C. A. 1, 1954) 213 F. 2d 651, 657.

The repurchase by a corporation of long-issued and outstanding preferred stock, originally issued for value, the terms of which specifically direct its retirement at a fixed price only slightly above par upon the happening of certain events which actually occurred, is a factor which points to the existence of a corporate or business motive or purpose for the redemption rather than to a stockholder's scheme for minimizing personal income taxes. See *Keefe* v. *Cote, supra.* While the redemption privileges of the preferred stock do not appear to have been carried out prior to May 1948, when a partial redemption was authorized, there is evidence in the record which indicates that such prior failure to redeem the preferred stock might have been due to restricted cash resources on the part of the company. At least, the Commissioner, upon whom rests the burden of proof on this issue, has failed to prove facts contrary to the foregoing.

In the case of Katharine, the second redemption completely eliminated her interest in the company. It followed the first by only 2 months and the delay was apparently due to the company's lack of cash to make a full redemption at one time. Under these circumstances, we do not deem either distribution in redemption of her stock to be essentially equivalent to the distribution of a taxable dividend. Regs. 111, sec. 29.115–9; cf. *Carter Tiffany*, 16 T. C. 1443.

### *Bad Debts.*

Due to the fact that Velo-King had been organized with limited capital and no credit standing, the company loaned the former the following sums of money for which it received demand promissory notes:

| | |
|---|---:|
| May 7, 1947 | $25,000 |
| July 31, 1947 | 50,000 |
| Aug. 22, 1947 | 25,000 |
| Aug. 27, 1947 | 25,000 |
| Aug. 30, 1947 | 50,000 |
| Total notes receivable as of Aug. 30, 1947 | $175,000 |

On October 6, 1947, the board of directors of the company and Velo-King authorized the conversion of the $175,000 in promissory notes into long-term notes with an average life of not less than 10 years with interest at the rate of 5 per cent. The interest was paid monthly to the company until March 1, 1948. Velo-King never paid interest on the $400,000 of debenture bonds issued to the company and subsequently transferred to Bullock.

Velo-King curtailed its production in stages from 1,000 units per day to 200 units per day, effective December 1, 1948. An anticipated recovery of the market following the 1948 election did not materialize and, contrary to expectations, its finished goods inventory increased rather than decreased.

The board of directors of Velo-King was informed by its chairman at a meeting on January 10, 1949, that the production of new velocipedes had been completely curtailed and that a skeleton force was being retained to produce repair parts and to continue final tooling on a rubber tire project.

In April 1949 Velo-King entered into an extension agreement with certain of its creditors and on June 17, 1949, it entered into a further extension agreement as a part of which the company agreed to subordinate its claim for $175,000 and interest represented by the notes to the claims of other creditors who were parties to the agreement. On August 18, 1949, Velo-King filed a petition for reorganization under chapter X of the Bankruptcy Act in the United States District Court for the Western District of New York, and by a stipulation filed in that proceeding on September 16, 1949, the company agreed to subordinate its claim for $175,000 and interest to the allowed claims of all general unsecured creditors.

A petition to classify creditors and stockholders was filed by the trustees in the District Court on December 27, 1949. The trustees classified the creditors as follows:

| | No. | Amount |
|---|---|---|
| Tax claims | 6 | $33, 703. 76 |
| Wage claims | 1 | 120. 00 |
| Secured claims | 5 | 64, 954. 54 |
| Unsecured preferred claims | 13 | 3, 512. 13 |
| Unsecured claims | 142 | 143, 687. 96 |
| Unsecured subordinated claims | 1 | 432, 666. 67 |
| Disallowed claims | 2 | 172, 815. 33 |
| | | $851, 460. 39 |

The unsecured subordinated claims of $432,666.67 represented the claims of Giles Bullock and the disallowed claims of $172,815.33 represented the amount owing to the company as evidenced by the $175,000 of promissory notes.

The trustees of Velo-King commenced an action against the corporation's directors on January 16, 1950, under section 58 of the New York stock corporation law on the ground that the capital of the corporation had been impaired by the payment of $75,000 to Colin Brown on February 9, 1948, in partial redemption of the corporation's capital stock. This action, together with other lawsuits and claims by and against the trustees, the E. C. Brown Company and Giles E. Bullock, were compromised and settled by the payment of $26,850.07 to the trustees on September 28, 1951.

The adjusted basis of the personal property taken from the books of Velo-King as of June 28, 1950, was as follows:

| | |
|---|---:|
| Merchandise inventory | $33, 215. 09 |
| Supply inventory | 30, 477. 56 |
| Equipment acquired from E. C. Brown Co. (without reference to appreciation thereof) | 72, 285. 47 |
| Equipment acquired in addition to that received from E. C. Brown Co. | 118, 245. 11 |
| | $254,223. 23 |

The assets of Velo-King were sold by order of the referee in bankruptcy at public auction on June 27 and 28, 1950, after advertisement. The proceeds were as follows:

| | *Sales prices* |
|---|---:|
| Machinery } Other personal property } | $167, 500 |
| Real estate | 75, 000 |
| Total | $242, 500 |

Approximately $300,000 (including the $26,850.07, previously referred to, received in compromise of litigation) was available on July 1, 1950, for the payment of allowances and expenses of $79,265.92, and for distribution to creditors.[4]

Velo-King had sales of approximately $2,000,000 during its fiscal year ended April 30, 1948, but its net income therefrom was only about $1,000. It sustained a loss of approximately $135,000 in its fiscal year ended April 30, 1949, on sales of about $1,000,000. Between May 1, 1949, and August 18, 1949, it incurred a loss of $75,000 from operations on sales of $145,000, but other income reduced the loss for this period to $44,000. From August 19, 1949, to June 2, 1950, it lost $69,000 on sales of $278,000 and incurred additional expenses amounting to $26,000 in connection with its bankruptcy proceeding.

Comparative balance sheets for April 30, 1949, August 18, 1949, and June 2, 1950, as prepared by outside auditors in accordance with the corporation's books and without audit or adjustment by the Commissioner, were as follows:

---

[4] So stipulated, although payment of the $26,850.07 was stipulated to have been made on September 28, 1951.

|  | Apr. 30, 1949 | Aug. 18, 1949 | June 2, 1950 |
|---|---|---|---|
| **ASSETS** | | | |
| Current: | | | |
| Cash | $14,219.02 | $9.07 | $20,540.69 |
| Receivables (net) | 105,313.85 | 77,933.32 | 13,007.26 |
| Inventories (net) | 283,031.11 | 147,528.60 | 33,215.09 |
| Total | 402,563.98 | 225,470.99 | 66,763.04 |
| Fixed: | | | |
| Land (net) | 32,805.59 | 31,252.96 | 30,824.82 |
| Buildings (net) | 364,894.10 | 359,881.22 | 346,792.04 |
| Machinery (net) | 688,880.86 | 670,497.63 | 623,203.25 |
| Total | 1,086,580.55 | 1,061,631.81 | 1,000,820.11 |
| Deferred and prepaid expenses | 5,563.15 | 32,017.11 | 33,483.00 |
| Other | 75,002.00 | 75,002.00 | 75,002.00 |
| Total | $1,569,709.68 | $1,394,121.91 | $1,176,068.15 |
| **LIABILITIES** | | | |
| Current: | | | |
| Notes payable | $225,055.09 | $101,265.85 | $23,195.67 |
| Accounts payable | 148,270.47 | 148,762.34 | 167,270.91 |
| Accrued expenses | 79,786.39 | 90,377.73 | 77,327.91 |
| Mortgage payable, current | 6,750.00 | 9,000.00 | 11,250.00 |
| Bonds payable, current | 44,000.00 | 44,000.00 | 88,000.00 |
| Total | 503,861.95 | 393,405.92 | 367,044.49 |
| Fixed: | | | |
| Mortgage payable (net) | 27,000.00 | 24,750.00 | 22,500.00 |
| Bonds payable (net) | 356,000.00 | 356,000.00 | 312,000.00 |
| Notes payable | 175,000.00 | 175,000.00 | 168,793.37 |
| Total | 558,000.00 | 555,750.00 | 503,293.37 |
| Capital: | | | |
| Capital stock | 29,670.00 | 29,670.00 | 29,670.00 |
| Unearned surplus (appreciation) | 787,767.38 | 769,261.57 | 725,136.80 |
| Earned surplus | (134,589.65) | (178,965.58) | (274,076.51) |
| Discount on bonds payable | (175,000.00) | (175,000.00) | (175,000.00) |
| Total | 507,847.73 | 444,965.99 | 305,730.29 |
| Total | $1,569,709.68 | $1,394,121.91 | $1,176,068.15 |

On September 27, 1950, an order was entered in the United States District Court in the reorganization proceedings for Velo-King, which denied the right of the company to set off $29,497.40, for which it was indebted to Velo-King on ordinary business transactions, against the indebtedness due it from Velo-King on the promissory notes.

The Commissioner disallowed bad debt deductions claimed by the company with respect to Velo-King's obligations to it as follows:

| Fiscal year ended | Amount of deduction disallowed | Reason stated |
|---|---|---|
| Aug. 31, 1949 | $116,373.92 | Debt did not become worthless in whole or in part during the taxable year. |
| Aug. 31, 1950 | 12,419.45 | (a) Failure to prove loss had occurred. (b) Any loss that did occur constituted a capital loss. |
| Aug. 31, 1951 | 38,256.78 | The loss was a nondeductible capital loss. |
| | $167,050.15 | |

The issues with respect to the denial of these deductions have been narrowly restricted by the pleadings and arguments of the parties, and we confine ourselves to the points which have been presented to us for decision. The Commissioner concedes that there was a bona fide indebtedness due the company during the taxable years ended in 1947, 1948, and 1949, but contends that there was no proof of the partial worthlessness of the debt in the fiscal years ended August 31, 1949 and 1950, and that by subordinating its claim to those of all general unsecured creditors on September 16, 1949, the company thereby converted the debt into a capital advance which, upon becoming worthless, was deductible as a capital loss only to the extent permitted by section 117.

The Commissioner relies upon *Bratton* v. *Commissioner*, (C. A. 6, 1954) 217 F. 2d 486, as authority for his position that the debt due the company was converted into a capital advance. That case is clearly distinguishable from the instant case since the taxpayer therein released the corporate debtor from its obligation to make repayment, whereas herein the company merely subordinated its claim to the claims of other creditors. We find no basis for holding that such action amounted to a conversion of an admittedly bona fide debt into a capital advance.

A deduction for the partial worthlessness of a debt due from another is allowable only to the extent that the taxpayer is able to demonstrate to the satisfaction of the Commissioner that, upon consideration of all of the surrounding circumstances, a part of the debt is not recoverable. Sec. 23 (k) (1) ;[5] Regs. 111, sec. 29.23 (k)–1 (*b*). The courts have recognized that the Commissioner has a certain amount of discretion in making his determinations with respect to such deductions and that they should not be disturbed unless they are plainly arbitrary and unreasonable. *H. W. Findley*, 25 T. C. 311; *Olympia Harbor Lumber Co.* v. *Commissioner*, (C. A. 9, 1935) 79 F. 2d 394, affirming 30 B. T. A. 114; *Stranahan* v. *Commissioner*, (C. A. 6, 1930) 42 F. 2d 729, affirming 14 B. T. A. 1405, certiorari denied 283 U. S. 822.

In claiming a bad debt deduction of $116,000 in respect of Velo-King's indebtedness to it of approximately $170,000, for its fiscal year ended August 31, 1949, the company has taken the position that as of that date two-thirds of the debt was not recoverable. Velo-

---

[5] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

\* \* \* \* \* \* \*

(k) BAD DEBTS.—

(1), GENERAL RULE.—Debts which become worthless within the taxable year ; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts ; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. \* \* \*

King had filed a petition for reorganization under the Bankruptcy Act less than 2 weeks previously, and it was not until December 27, 1949, that the trustees filed a petition to classify the creditors and stockholders. The corporation's balance sheet as of August 18, 1949, as prepared by outside auditors, does not show it to be insolvent. To the contrary, it had $1,394,000 in assets to meet $950,000 in obligations which included the debts to the company and to Bullock. While the excess of assets over liabilities was represented by the appreciation in value entered on the books in August of 1947, the valuation was made by a reputable firm and there was no evidence as of the fiscal year ended August 31, 1949, that the liquidation values of the assets were less than their book values. The sale of these assets did not take place until June 27 and 28, 1950, and such subsequent event may not be related back to the prior year. *H. W. Findley, supra.* While bankruptcy is generally an indication of the worthlessness of at least a part of an unsecured and unpreferred debt, Regs. 111, sec. 29.23 (k) (1) (*b*), there is no proof that Velo-King was actually bankrupt by August 31, 1949. See *Lehman v. Commissioner,* (C. A. 2, 1942) 129 F. 2d 288.

The profit and loss statements of Velo-King show a large operating loss for the 15 months before August 31, 1949, and the production of new velocipedes had been completely curtailed by January 10, 1949. However, a slacking off of the market and a cutback in production do not necessarily establish the partial worthlessness of an obligation. *H. W. Findley, supra.* There is evidence that in January of 1949, while curtailing the velocipede production, Velo-King was continuing final tooling on a rubber tire project. It is quite possible that the creditor arrangements and even the bankruptcy proceeding were designed to straighten out the corporation's affairs so that it could eventually meet its obligations.

The foregoing facts, while they indicate that Velo-King was in a less favorable position on August 31, 1949, than when the indebtedness was incurred, fall short of establishing an abuse of discretion by the Commissioner in denying the deduction claimed in 1949 for partial worthlessness of the Velo-King indebtedness. We sustain the Commissioner's action in denying the deduction in its entirety. *H. W. Findley, supra.*

However, it is apparent from the facts herein that Velo-King's situation so deteriorated during the company's fiscal years ended August 31, 1950, and August 31, 1951, that the latter is clearly entitled to at least the deductions claimed in those years. The Commissioner contests the deductions for 1951 only on the ground that it was a capital loss and we have previously decided that issue adversely to him.

*Decision will be entered under Rule 50.*