EARL V. WHITWELL AND CECIL WHITWELL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 52880. Filed May 15, 1957.

*Thomas A. Harrell, Esq.*, for the petitioners.
*William H. Gray, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined a deficiency of $13,509.50 in petitioners' income tax for the calendar year 1950. All of the facts are stipulated and the questions presented have to do with income tax consequences resulting from transactions involving oil- and gas-producing properties under the unitization statutes of Louisiana.

### FINDINGS OF FACT.

Petitioners are married and they live in Shreveport, Louisiana, and they filed their joint income tax return for the year 1950 with the collector of internal revenue for the district of Louisiana.

Prior to 1949 petitioners owned undivided interests in oil and gas leases in Webster Parish, Louisiana, which had been unitized into separate units known as Logan No. 1, Logan No. 2, and Hodges No. 1. During the year 1949 petitioners, together with other owners, drilled wells on each of the above units which became commercially productive. Logan No. 1 well was completed in the Bodcaw Sand and the other two wells were completed in the Davis Sand. The three units were adjacent to a larger unit known as the Cotton Valley Field, hereinafter referred to as Cotton Valley. The percentages of petitioners' interests in the wells were as follows:

| | Per cent |
|---|---|
| Logan No. 1 | 10.15625 |
| Logan No. 2 | 10.15625 |
| Hodges No. 1 | 11.74242 |

Prior to 1950, petitioners had exercised the option granted to them by Regulations 111, section 29.23 (m)–16, and had elected to capitalize intangible drilling costs as permitted by the regulations. The adjusted basis as of April 15, 1950, of petitioners' interest in each well was as follows:

| | |
|---|---|
| Hodges No. 1 | $16,459.09 |
| Logan No. 1 | 14,457.60 |
| Logan No. 2 | 13,529.81 |

Louisiana State statutes, some portions of which we have set forth in a footnote, authorize the State commissioner of conservation to

compel the pooling of the interests of two or more landowners into one unit for the production of gas and oil.[1]

The design of the unitization statutes is first, to give the owner of each separate tract which is unitized an interest in the unit as a whole sufficient to afford him recovery of oil or gas, as the case may be, from the unit in an amount equivalent to that which underlies his property; and second, the costs of drilling and development are to be apportioned among the owners as their respective interests might appear.[2]

On April 15, 1950, the Louisiana commissioner of conservation issued Orders Nos. 10–W and 10–X which unitized the three units mentioned above into Cotton Valley. Order No. 10–W pertained to the Bodcaw Sand wells (Logan No. 1) and Order No. 10–X pertained to the Davis Sand wells (Logan No. 2 and Hodges No. 1). These orders both provided that the owners of the adjacent areas brought into the unit be fully compensated for the actual cost of the development of the adjacent areas. The orders fixed the reasonable cost of the three wells at $150,000 each.

This resulted in the following apportionment of the costs of development and of the facilities:

Petitioners' share of the costs of the Hodges and Logan units prior to unitization, for which they are entitled to reimbursement:

| | |
|---|---:|
| Logan No. 1 | $15,234.38 |
| Logan No. 2 | 15,234.37 |
| Hodges No. 1 | 17,613.64 |
| Total | $48,082.39 |

On May 3, 1950, the Cotton Valley Operators Committee, hereinafter sometimes called the committee, which had been appointed the operator of the unit by the commissioner, met and adopted the resolution requiring the general manager of the committee to carry into effect the allocations of production set forth under the commissioner's orders. The resolution concluded as follows: "The assessment of cost of development, facilities, plant and operations shall be deferred pending further action by this committee."

---

[1] Louisiana Revised Statutes, title 30, chapter 1 (1950).

Sec. 4. Jurisdiction and powers of commissioner; rules and regulations

* * * * * * *

B. The commissioner shall make such inquiries as he thinks proper to determine whether or not waste, over which he has jurisdiction, exists or is imminent. In the exercise of this power the commissioner has the authority: to collect data; to make investigations and inspections; to examine properties, leases, papers, books, and records; to examine, survey, check, test, and gauge oil and gas wells, tanks, refineries, and modes of transportation; to hold hearings; to provide for the keeping of records and the making of reports; and to take any action as reasonably appears to him to be necessary to enforce this Chapter.

Sec. 10. Agreements for drilling units; pooling interests; terms and conditions; expenses

A (1) (c). In the event pooling is required, the cost of development and operation of the pooled unit chargeable by the operator to the other interested owners shall be limited to the actual reasonable expenditures required for that purpose, including a charge for supervision. In the event of a dispute relative to these costs, the commissioner shall determine the proper costs, after notice to all interested persons and a hearing.

[2] See *Crichton* v. *Lee*, 209 La. 561, 25 So. 2d 229.

On June 2, 1950, the committee met again and a resolution was adopted that the committee pay the owners of the Logan No. 2 and Hodges No. 1 wells $150,000 per well (which had been the amount previously determined by the commissioner) and, although a formal resolution was apparently not adopted, at this same meeting, the minutes reflect:

It was the general view of the meeting that this well [the Logan No. 1 well] should be paid for by all owners of operating rights in the enlarged Bodcaw Sand Participating Area in proportion to their participation therein.

Commissioner's Order 10–W had also fixed the reasonable cost of Logan No. 1 well at $150,000.

Finally, on August 31, the third meeting of the committee was held and further discussion was had with respect to the settlement of the costs in question. After considerable discussion, a resolution was passed providing as follows:

RESOLVED that the adjustment for well costs consequent to the admission of new acreage to any participating area, as previously agreed to by this Committee, be liquidated through the payment to the owners of the wells in question of eighty (80%) per cent of seven-eighths (7/8ths) of all production from the particular participating area in which the well or wells to be paid for are situated, such payments to be based on the average market price per barrel of the products delivered prevailing in the Cotton Valley Field at the time of delivery.

Based upon this resolution, the committee had prepared statements and schedules reflecting the amounts due to each owner for the well costs and those statements were sent to the purchasers of the products produced from the Cotton Valley Field, together with instructions to withhold from 80 per cent of seven-eighths of the production purchased, the amount due from each operator and to remit these amounts in the percentage established to those persons to whom such payments were due. This was done and petitioners received, during the year 1950, from October and November production, the sum of $47,358.58.[3] They were charged under the schedule with $11,117.65.

At the same time the foregoing statements and schedules were prepared and circulated, the Cotton Valley Operators Committee also prepared a statement showing the amount owed by the petitioners and others whose property had been included within the Cotton Valley unit for their proportionate cost of the equipment and facilities located on the unit as it existed prior to unitization. These schedules showed petitioners owed a total of $22,592.62 for these interests and petitioners paid, in cash, during the year 1951, this amount of money. Petitioners capitalized this payment on their 1950 return and took a deduction for depreciation of $2,484.44.

---

[3] Petitioners state in their brief the discrepancy in what they received ($47,358.58) and what they were entitled to receive ($48,082.39) was due to the fact that the difference was not paid until 1951.

Petitioners did not include any part of the $47,358.58 received in 1950 in their income for that year. Respondent, in the notice of deficiency, determined—

the foregoing amount of $47,358.58 constitutes ordinary income as being in the nature of an oil payment entitling you to future payments of a stated sum to be made out of a specified fraction of oil or gas to be produced from the operation of income producing property in which you owned and/or retained an economic interest. * * *

The amount of $11,117.65 in oil payments which were charged to you or paid to others by you, has been excluded from gross income from the property subject to depletion.

### OPINION.

The first question is whether the oil payments received by petitioners in the year 1950 from 80 per cent of seven-eighths of the production of the Cotton Valley unit constitute ordinary income to the petitioners subject to depletion.

Respondent's argument is that the unitization proceedings resulted in a nontaxable exchange whereby petitioners received 80 per cent of seven-eighths production of the Cotton Valley unit in an exchange of their interest in three wells which were brought into the Cotton Valley unit for a smaller interest in the production of the Cotton Valley unit; that in effect, the petitioners, as a result of the exchange had a capital investment in the unitized field and the method for recovery of capital is by depletion.

Petitioners argue the unitization proceedings effected an exchange under the provisions of section 112 (c) (1), Internal Revenue Code of 1939, and the net amount of the oil payments received by petitioners constituted "boot" received in an exchange of like properties which should be accorded capital gains treatment.

A recent opinion of this Court answers the entire contention of petitioners and that part of the contention of respondent which is based on the unitization proceedings being a nontaxable exchange of oil interests. In *Belridge Oil Co.*, 27 T. C. 1044, there was involved a voluntary unitization of oil-producing properties in California. There, as here, it was contended the effect of the unitization was a nontaxable exchange of oil-producing rights by a taxpayer entering the unit for a new and separate interest in the unitized operation of the larger field. In the course of the opinion we stated (pp. 1053, 1054) :

To uphold the respondent's determination, we must find that the unitization agreement here, preferably both in form and in substance, effected an exchange; and, if not in form, certainly in substance.

Our examination of the unitization agreement discloses no words of conveyance. * * * we find no intention on the part of the participants to convey or exchange their economic interests in the 64 Zone. * * *

We think the net effect of what the participants to the agreement accomplished was the creation and organization of a consolidated production operation

for the extraction of their respective shares of oil from the whole pool in which they held separate operating rights. * * * We think the unitization agreement here was nothing more than another joint effort on the part of the owners of the producing rights to the Zone to best conserve their respective individual interests therein by joining in a plan for the most economical and productive operation of the whole field. Hence, we think each participant had exactly the same interests and rights in its respective properties after unitization as before, except that by mutual consent they had agreed to limit their production and operate their wells in the most economically feasible way from the standpoint of conservation considerations.

We realize that in the *Belridge Oil Co.* case the unitization was by voluntary agreement while here it was by compulsory action under a State law. But in either instance the result is the same. As we stated in the *Belridge Oil Co.* case, unitization is the "consolidation of oil-producing properties under centralized production management." Whether that consolidation was voluntary or compulsory is immaterial on the question of whether property or property rights were conveyed. In either instance unitization amounts to no more than a production and marketing arrangement as between owners of oil-producing properties or rights.

Where unitization takes place, the parties are faced with the problem of determining the portion of the oil pool beneath their properties which will go to each participant. If the real property owned by each of the parties were completely undeveloped at the time of unitization, it would be a simple matter for the parties, on the basis of acreage, to determine what division should be made of the oil produced from the pool beneath their unitized lands. However, it is much more usual that the parties are in various stages of development for oil production at the time of unitization, and in such a case it would be manifestly unfair to make the oil allotments on a straightforward acreage basis. To remedy such unfairness, the parties, in addition to acreage, take into consideration the various stages of development of each property in determining the shares of the oil production. If one or more owners have developed their land for oil production they should receive their aliquot portion of the production from the oil pool based on their acreage and in addition thereto a fraction of the production that will bring in an amount that will equalize the development costs.

Thus, in the case before us, the parties in determining the shares of oil production from the unitized area to go to each party, took into consideration the acreage as well as the stage of development of the property owned by each party at the time of unitization. No interests were assigned or conveyed. There was nothing sold or exchanged. There was merely an allocation of the production of oil from the pool beneath their several properties based on both acreage and development costs.

We do not think it was necessary for respondent to argue there was a nontaxable exchange of interests here in order to sustain his determination that the oil payments constituted ordinary income to the petitioners subject to depletion.

Many of the cases determining the right to depletion allowance are authority here. In *Anderson* v. *Helvering*, 310 U. S. 404, 407, it is stated:

It is settled that the same basic issue determines both to whom income derived from the production of oil and gas is taxable and to whom a deduction for depletion is allowable. That issue is, who has a capital investment in the oil and gas in place and what is the extent of his interest. [Citations.]

There can be no doubt that these petitioners had an economic interest in the oil in place. As stated in *Palmer* v. *Bender*, 287 U. S. 551, a capital investment in the oil in place can be acquired where the taxpayer "secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." See also *Hugh Hodges Drilling Co.*, 43 B. T. A. 1045, 1069, 1070, where we said:

This rule is applicable in all cases where, as a matter of substance, without regard to formalities of conveyancing, the reserved or deferred payments are to be derived solely from the production of oil and gas. * * *

The rule is also applicable where the right is to the payment of a specified sum of money payable out of proceeds from oil production. *Thomas* v. *Perkins*, 301 U. S. 655. The question is whether the taxpayer is dependent upon oil production for payment of the agreed amount. If he is, then he receives ordinary income subject to depletion.

It seems apparent to us the facts of this case come well within the rule of the foregoing cases. The unitization resulted in a relationship whereby the taxpayers acquired the right to the payment of $47,358.58 payable out of 80 per cent of seven-eighths production of the oil wells. Under the plan petitioners were, in effect, obligated to make oil payments in the sum of $11,117.65 as their proportionate share of the development costs of the property brought into the Cotton Valley unit. The Commissioner of Internal Revenue rightly excluded this sum but the balance, or $36,240.93, was ordinary income subject to depletion.

The $22,592.62 which petitioners paid in 1951 was a separate cash transaction. Although it was part of the unitization transaction, the unitization plan adopted in 1950 merely called for petitioners' paying this sum as petitioners' share of reimbursement to the owners of property previously within the unit. The plan did not call for this payment to be made out of oil production and petitioners paid this in cash during the year 1951. Petitioners merely capitalized this payment in their income tax return for 1950 and they took depreciation in the sum of $2,484.44.

378

Petitioners make some argument that they should be allowed to deduct the $22,592.62 as it is similar to the $11,117.65 which respondent concedes could be deducted. Their argument, in effect, is that they received the money to make the cash payment of $22,592.62 from the $47,358.58 received from oil payments, and, as to this sum, it was also merely a conduit through which the money received from oil payments passed on its way to the owners of the property previously within the unit. The answer is, the plan did not set up this payment in the same manner as the $11,117.65 payment. As to the latter, there was a complicated system of statements and schedules showing the payments were actually oil payments by petitioners and therefore deductible from gross depletable income. That is not true with respect to that part of the plan calling for petitioners' payment of $22,592.62. This was in the nature of an assessment against petitioners for the proportionate cost of the equipment and facilities located on the Cotton Valley unit as it existed prior to unitization. This could be, and, in fact was, paid in cash. No provision was made for its being paid out of oil payments. Petitioners were not entitled to have their oil payments reduced for tax purposes, because they devoted part of them toward satisfying an assessment against them. *Anderson* v. *Helvering, supra.* The payment was not dependent upon oil production under the unitization plan.

For the reasons indicated, we hold petitioners under the unitization plan acquired an economic interest in oil and gas in place; that under the plan they had a right to receive a net of $36,240.93 from the oil production which was ordinary income subject to depletion. This seems to be exactly as respondent determined but there is some indication in the briefs that a Rule 50 determination might be desirable, so

*Decision will be entered under Rule 50.*