DANE COUNTY TITLE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57497.   Filed December 31, 1957.

*Charles P. Seibold, Esq.,* for the petitioner.
*Thomas J. Donnelly, Jr., Esq.,* for the respondent.

TIETJENS, *Judge:* The Commissioner determined a deficiency in the petitioner's 1951 income tax in the amount of $6,707.55. There are two issues for our decision: (1) Whether the petitioner sustained an abandonment loss in 1951 as a result of its permanently discarding certain title abstract records it had purchased in 1929 from the Dane Abstract of Title Company; and (2) what portion of the petitioner's 1951 microfilming expenses represented the cost of microfilming its old title records. The petitioner concedes that such microfilming cost is a nondeductible capital expenditure.

Some of the facts are stipulated. Such facts are found as stipulated and with the exhibits attached thereto are included herein by reference.

The petitioner is a Wisconsin corporation, organized in the year 1902, with its principal place of business in Madison, Wisconsin. The petitioner's income tax return for the year 1951 was filed with the then collector of internal revenue for the district of Wisconsin.

From the year 1902 to the present time the petitioner has engaged in the title abstract and title insurance business in Dane County, Wisconsin.

Dane Abstract of Title Company (not to be confused in name with the petitioner) was in the year 1929, and for many years prior thereto, a Wisconsin corporation engaged in the title abstract business in Dane County, Wisconsin, with its principal place of business at 111–113 South Carroll Street, Madison, Wisconsin. John T. Kenney was its principal stockholder and chief operating officer. This company will hereinafter be referred to as the Kenney Company, and the title abstract records of this company as the Kenney records.

In the year 1929 the petitioner and the Kenney Company were the only two operating general title abstract companies in Dane County and those two companies controlled the major portion of the title abstract business in that county at that time.

On April 18, 1929, Stanley C. Hanks and L. M. Hanks, the petitioner's then majority stockholders, entered into an agreement to purchase all physical assets of the Kenney Company for a total consideration of $55,000. On April 25, 1929, all of the real property of the Kenney Company was conveyed by deed to Stanley C. Hanks and L. M. Hanks. On May 20, 1929, they transferred to the petitioner, by deed, the title to that property.

On April 27, 1929, the personal property of the Kenney Company was transferred by bill of sale to Stanley C. Hanks and L. M. Hanks. The personal property was described as follows in the bill of sale:

all the personal property now owned by said first party [Kenney Company] including typewriters, desks, Rotary Neostyle Mimeograph, Sundstrand Adding Machine, filing cases, abstract of title records, abstracts, furniture, blank forms, office supplies now owned by said Company used in the conduct of its business together with all furniture and furnishings owned by said Company and contained in the building at 111–113 South Carroll Street, Madison, Wisconsin.

On May 16, 1929, Stanley C. Hanks and L. M. Hanks sold all of their right, title, and interest in the above-mentioned personal property to the petitioner.

The purchase of the Kenney Company property was recorded by the petitioner in its ledger accounts as follows:

*Carroll Street Property*

| | |
|---|---:|
| Dane County title records | $20,400 |
| Office furniture and fixtures | 2,500 |
| Buildings | 20,000 |
| Land | 12,100 |

The Kenney Company was dissolved in 1929 after the sale of all of its assets. The petitioner did not obtain a covenant against competition from the Kenney Company or its stockholders, nor did the petitioner ever use the name or location of the Kenney Company.

The title records maintained by the petitioner in 1929 and thereafter consisted of a tract index containing information on every parcel of land in Dane County, including the names of the grantors and grantees in each transaction affecting a parcel of land, the dates and types of instruments affecting a parcel of land, and the document number of each publicly recorded instrument affecting title to a parcel of land.

The Kenney records consisted of a tract index with entries recording the parcel of land and the document number of each publicly recorded instrument affecting title to the parcel of land.

In 1929 an abstract of title could be prepared from either set of records; however, the petitioner's own records were easier and more convenient to use because they contained more information than the Kenney records.

In 1943 a public tract index was installed in Dane County from which index title abstracts could be prepared. Prior to that time it was a practical necessity for an organization in the title abstract business to have a tract index of its own, since title abstracts could be prepared from the public grantor-grantee index only at great inconvenience and with the expenditure of considerable time.

The Kenney tract index would have avoided the time and inconvenience involved in preparing title abstracts from public records, for years prior to 1929, for anyone pursuing the title abstract business in Dane County.

The cost of manually reproducing a tract index from public records in 1929 would have been about $100,000.

Destruction of records insurance was not available in 1929. Such insurance became available in 1936 at the rate of $2.50 per thousand dollars coverage and the petitioner took out insurance at that time to the extent of $100,000 coverage, which it retained throughout the year 1951.

The number of instruments recorded in the Registrar of Deeds office in Dane County, the number of orders received by the petitioner, and its net income, during the years 1927 through 1931, are as follows:

| Year | Recorded instruments | Petitioner's orders | Petitioner's net income |
|------|------|------|------|
| 1927 | 14,146 | 6,243 | $6,022 |
| 1928 | 14,489 | 6,007 | 9,486 |
| 1929 | 13,057 | 5,992 | 8,228 |
| 1930 | 12,008 | 5,149 | 8,371 |
| 1931 | 10,904 | 4,528 | 5,353 |

The Carroll Street property (land and buildings) was never used by the petitioner in its business and was sold by the petitioner in 1935. The office furniture and fixtures formerly owned by the Kenney Company were used by the petitioner in its business. The Kenney records were never used by the petitioner in preparing abstracts of title and they were not kept up to date by the addition of entries for transfers made after their acquisition in 1929.

In 1929, the Kenney records had a value to the petitioner as a "standby" record in the event of destruction of its principal records.

The Kenney records were retained by the petitioner in a separate vault on its premises until 1951 when the petitioner microfilmed its principal records. A copy of the film was stored in a vault off the premises subsequent to that time.

At a meeting held on December 13, 1951, the petitioner's board of directors adopted the following resolution:

Due to completion of microfilm project by the Company, wherein all of the essential title records owned and now used by it have been microfilmed and one extra copy of said film obtained and since one copy of said film is now stored in a vault off the Company premises, the title records of the Dane Abstract of Title Company acquired in 1929 are now of no further use or value, it is resolved that the said records be discarded permanently as an asset of said Corporation. Motion carried.

The Kenney records were physically destroyed by burning in 1951 or 1952.

The petitioner's purpose in microfilming its title records was to insure and safeguard their continued use in case of any disaster or mutilation or destruction of the records and also as a safeguard against the physical deterioration which results from their continued use.

During the year 1951 the petitioner's microfilming costs were about $10,000, which included about $7,000 for labor and $3,000 for materials and supplies.

During the year 1951 the petitioner microfilmed its title records covering the years 1832 through 1950. It also microfilmed twice, every instrument recorded in the office of the Registrar of Deeds and it

microfilmed all of its abstract orders that year as well as other public records, certain accounting records, and other miscellaneous documents.

In microfilming its old title records during 1951, petitioner microfilmed about 100,000 documents. In microfilming documents recorded with the Registrar of Deeds during 1951 and its abstract orders that year, the petitioner microfilmed about 80,000 documents. The number of other public documents, accounting records, and miscellaneous documents microfilmed by the petitioner during 1951 is unknown.

The costs of microfilming, per page, varies in accordance with the type of records microfilmed, depending on whether the materials may be fed into the microfilm machine automatically or whether they must be fed into it manually. Some of the petitioner's old title records could be microfilmed automatically.

On its tax return for the year 1951, the petitioner claimed a loss on assets abandoned, which pertained to the Kenney records, in the amount of $20,400.

The Commissioner disallowed that deduction on the ground that the petitioner had not established that the alleged loss from abandonment of records constituted an allowable deduction from gross income under the provisions of section 23, I. R. C. 1939.

The Commissioner also determined that the cost of microfilming the old title records was a capital expenditure and not deductible by the petitioner. He determined that such microfilming costs were not less than $5,000 and increased the petitioner's income in that amount.

The petitioner's predominant purpose in purchasing the Kenney records was to eliminate competition.

## OPINION.

The first issue for decision is whether the petitioner sustained an abandonment loss in 1951 as a result of its permanently discarding the Kenney records as an asset.

It was stipulated that shortly after Stanley C. Hanks and L. M. Hanks purchased the real property of the Kenney Company, they transferred it to the petitioner, and about that same time the personal property, including furniture and fixtures, the Kenney records, and other items were also transferred to the petitioner from Stanley C. Hanks and L. M. Hanks. The total cost to the petitioner of those assets was not mentioned in the stipulation or the document introduced into evidence by which the personal property was transferred to petitioner. However, certain of the petitioner's ledger accounts were introduced into evidence which showed that the Kenney Company real property was recorded on the petitioner's books at a cost of $32,-100, the Kenney Company furniture and fixtures were recorded at a

cost of $2,500, and the Kenney records were recorded at a cost of $20,400. These records appear to have been kept in the ordinary course of the petitioner's business, and we accept the petitioner's books and records as showing the petitioner's cost of the various Kenney Company assets. The Commissioner's argument that the petitioner has not shown the cost of the Kenney records to it is therefore without merit.

Next we turn to the question of the petitioner's purpose in purchasing the Kenney records. The petitioner argues that its purpose was to acquire a set of standby records and the Commissioner argues that it was for the purpose of eliminating competition.

The cost of eliminating competition is a capital asset. Where the elimination is for a definite and limited term the cost may be exhausted over such term, but where the benefits of the elimination of competition are permanent or of indefinite duration, no deduction for exhaustion is allowable. *B. T. Babbitt, Inc.*, 32 B. T. A. 693 (1935).

John T. Kenney, Stanley C. Hanks, and L. M. Hanks, the parties to the 1929 transaction, were dead at the time of the hearing of this case. Thus there is no direct testimony as to Stanley C. Hanks's and L. M. Hanks's purpose in purchasing the Kenney records. However, subsequent events and other factors in the record shed some light on the answer to that question.

In 1929 the petitioner and the Kenney Company were the only two operating general title abstract companies in Dane County and they controlled the major portion of the title abstract business in that county at that time. At that time both the Kenney Company and the petitioner maintained tract indexes, while Dane County maintained only a grantor-grantee index. It was much easier to prepare a title abstract from a tract index than from a grantor-grantee index and it was much easier to prepare a title abstract from the petitioner's tract index than from the Kenney Company's tract index because the former was much more complete than the latter.

It is obvious that the petitioner, by purchasing the Kenney records, foreclosed a third party from purchasing such records and then competing with the petitioner in the title abstract business in Dane County. It also appears obvious to us that for all practical purposes, when the petitioner purchased the Kenney records it foreclosed the possibility of anyone else's entering the title abstract business in Dane County, because of the difficulty in preparing title abstracts from the public records and because of the great cost involved in producing a tract index (it would have cost about $100,000 to reproduce the petitioner's tract index in 1929). Another factor indicating that the purpose of purchasing the Kenney records was to eliminate competition, is that the petitioner sold the Kenney Company real property in 1935 without ever having used it. That the petitioner did not obtain a covenant

against competition from the Kenney Company or its stockholders does not, in our opinion, show that the petitioner's purpose was not to eliminate competition because as a practical matter such a covenant was not needed.

We think the petitioner has failed to prove that its purpose in purchasing the Kenney records was to acquire a set of standby records in the event of destruction of its principal records. The petitioner never used the Kenney records in preparing title abstracts and it did not keep them up to date after it purchased them. The Kenney records were kept in a separate vault so that if the principal records were destroyed, petitioner could use them in preparing title abstracts insofar as years prior to 1929 were concerned. To this extent the Kenney records had standby value to the petitioner. That the petitioner was not impressed with such value is shown in that it took out destruction-of-records insurance in 1936 when it became available in Wisconsin, with coverage to the extent of $100,000, which insurance was kept in force up to and throughout the year 1951.

It is our opinion from considering the record as a whole, that the petitioner's predominant purpose in purchasing the Kenney records was to eliminate competition and was not to acquire a set of standby records and that if the latter was one of the petitioner's purposes in purchasing such records, it was only incidental to the former. It is apparent that even if the Kenney records had been physically destroyed, the benefit of their purchase in eliminating competition would have been a continuing benefit which would have endured despite their destruction. The petitioner contends that if some part of the purchase price should be assigned to the cost of eliminating competition then we should make such an allocation. However, we think that the record does not furnish us with sufficient basis for making a division of the price paid between what might have been paid for the records and what we think was primarily paid to eliminate competition.

The petitioner's president testified that the total cost of microfilming the old records was $2,035. This amount was admittedly an estimate. On cross-examination, the petitioner's president was questioned in regard to the petitioner's total microfilming costs for the year in comparison with the total number of documents microfilmed so that it could be determined whether the $2,035 estimate was approximately proportionate to the cost of microfilming a similar number of other documents. It was thus determined that the petitioner's total microfilming cost was about $10,000 ($7,000 for labor and $3,000 for materials), that the petitioner microfilmed about 100,000 documents in microfilming its old records, and that it microfilmed somewhat more than 80,000 other documents. It was also determined that the cost of microfilming documents varied considerably depending on whether the document could be fed into the machine manually; and in

the case of the old records, a majority of them could be automatically microfilmed, but a substantial portion of them had to be microfilmed manually.

Upon a careful consideration of the petitioner's estimate in the light of the other pertinent evidence in the record, we have come to the conclusion that the petitioner has failed to sustain its burden of showing that the Commissioner erred in determining that the cost of microfilming the old records was not less than $5,000, and accordingly we sustain the Commissioner on this issue.

*Decision will be entered for the respondent.*