*Decisions will be entered under Rule 50.*

RADIO STATION WBIR, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60621. Filed January 23, 1959.

*Temple W. Seay, Esq.*, for the petitioner.
*Jack D. Yarbrough, Esq.*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in petitioner's income tax as follows:

| Year ending Dec. 31 | Deficiency |
|---|---|
| 1952 | $6, 455. 09 |
| 1953 | 8, 970. 29 |

Three issues are presented for decision:

(1) Whether certain expenditures in the amount of $37,016.68, made by petitioner during the year 1953 in connection with the preparation and conduct of hearings before the Federal Communications Commission for the purpose of acquiring a television construction permit and ultimately a television license, are deductible as ordinary and necessary business expenses or constituted capital expenditures.

(2) If capitalized, whether such expenditures may be recovered through the annual allowance for depreciation.

(3) Whether, in computing depreciation for the years 1952 and 1953, petitioner is entitled to reduce the useful life of its FM broadcasting equipment from 10 years to 5 years.

The parties apparently agree that the allowance of a claimed loss carryback with respect to the year 1952 will be resolved by our disposition of the aforementioned issues.

### FINDINGS OF FACT.

The stipulated facts and attached exhibits are incorporated herein by this reference. Petitioner is a corporation with its principal office and place of business at 618 South Gay Street, Knoxville, Tennessee. It filed its Federal income tax returns for the years in issue with the director of internal revenue at Knoxville, Tennessee.

The stockholders of petitioner, the positions they held, and the shares held by them during the years before the Court are set forth as follows:

| Name and address | Office | Number of shares | Per cent of stock |
|---|---|---|---|
| John P. Hart, Knoxville, Tennessee | President and director | 2,000 | 10 |
| Gilmore N. Nunn, Lexington, Kentucky | Vice president and director | 6,000 | 30 |
| Robert L. Ashe, Knoxville, Tennessee | Vice president and director | 1,500 | 7½ |
| Martha H. Ashe, Knoxville, Tennessee | Secretary-treasurer and director | 4,500 | 22½ |
| Radio Cincinnati, Inc., Cincinnati, Ohio | | 6,000 | 30 |
| Total | | 20,000 | 100 |

Radio Station WBIR was first granted a construction permit by the Federal Communications Commission (hereinafter referred to as F.C.C.) to construct its AM (amplitude modulation) broadcast facility in 1940. It received its license to operate pursuant to application to the F.C.C. and commenced AM radio broadcasting in 1941. At that time it was owned by one Birdwell. The petitioner purchased the station in early 1946. At that time, the petitioner's stock was owned entirely by the family of Gilmore N. Nunn, who presently is petitioner's vice president.

FM (frequency modulation) radio broadcasting was introduced to the radio broadcasting field in the late 1940's. FM was regarded generally by the broadcasting industry as superior to AM in that it allowed a higher fidelity of transmission than AM and also was generally more free from static and other interference than AM. With the introduction of FM, members of the radio broadcasting industry in general felt that this new and superior method of broadcasting would largely, if not entirely, supplant AM broadcasting facilities.

Petitioner felt that it should acquire an FM broadcasting facility. This decision was prompted by two considerations: (1) Petitioner's AM broadcasting station had a transmitter power of 250 watts. This is the lowest power of the lower powered AM stations. Due to its low power, the effective range of petitioner's AM broadcast was limited to an area within a radius of about 20 miles from Knoxville. The number of persons residing in that area was estimated to be approximately 350,000. The FM facility which petitioner proposed to acquire had an effective broadcasting range of about 70 miles, which encompassed an area that had about 1,250,000 residents. Petitioner's source of income is the fees it charges for broadcasting business advertisements. The amount of the fee depends, in part, upon the number of persons living in the area "covered" by petitioner's broadcast. Since anticipated FM coverage was substantially greater than its AM coverage, petitioner felt increased fees could be charged its advertising clients. (2) Petitioner wished also to hedge against the fear of losses in revenue resulting from expected diversion of advertising from AM radio to FM radio.

Petitioner applied to the F.C.C. for an FM construction permit in 1947. It expended about $21,000 for the purchase of its FM facilities. Its FM station was licensed and commenced broadcasting in 1949. Subsequently, petitioner received a modified FM construction permit on August 4, 1949, and on the dates shown below it received further licenses from the F.C.C. to operate an FM station for the periods indicated:

| Date | Length of service |
|------|-------------------|
| May 18, 1950 | May 18, 1959, to Mar. 1, 1952 |
| Feb. 27, 1952 | Mar. 1, 1952, to Aug. 1, 1952 |
| July 24, 1952 | Aug. 1, 1952, to Aug. 1, 1955 |
| July 20, 1955 | Aug. 1, 1955, to Aug. 1, 1958 |

About 1951 it became apparent to petitioner that FM was not going to supplant AM broadcasting in petitioner's area for a number of reasons, of which, lack of receivers in the hands of the public, insufficient distinction in the quality of reception, poor quality of receivers, and the advent of television were among the more prominent. Since it was felt that the general public was not receiving FM broadcasts, petitioner's advertising clients were not interested in purchasing advertising on the FM broadcasts. During the period in issue petitioner with a few exceptions broadcast the same material simultaneously from its AM and FM transmitters. Except for insignificant amounts, petitioner has been unable to charge its advertising clients any fee for use of its FM facility in addition to that charged for use of the AM facility. Petitioner has continued to retain its FM license and operate its FM station because its FM broadcast reaches some people who do not receive the AM broadcast and also it hopes "that eventually FM might be of some economic value to us."

The petitioner claimed a deduction in its 1952 income tax return in the amount of $8,855.30 which represented depreciation upon its AM and FM equipment, Civil Defense equipment, furniture and fixtures, and leasehold improvements. The respondent allowed the sum of $7,524.99 as a depreciation deduction in 1952. The amount disallowed, $1,330.31, results from the rejection by the respondent of the 5-year useful life claimed by the petitioner upon its frequency modulation (FM) equipment in 1952.

The petitioner claimed a deduction in its 1953 income tax return in the amount of $9,826.83 which represented depreciation upon its AM and FM equipment, Civil Defense equipment, furniture and fixtures, and leasehold improvements. The respondent allowed the sum of $7,661.87 as a depreciation deduction in 1953. The amount disallowed, $2,164.96, results from the rejection by the respondent of the 5-year useful life claimed by the petitioner upon its frequency modulation (FM) equipment in 1953.

With the advent of feasible commercial television broadcasting, petitioner determined that it should acquire a license from the F.C.C. to broadcast television programs. Its decision to get into the television broadcasting business was prompted generally by the same type of considerations as those respecting FM, i.e., (1) a desire to increase income by attracting new advertising clients to use television broadcasts; (2) a desire to keep as clients those advertisers then using petitioner's radio facilities but which were expected to switch to television advertising. It was felt by petitioner that if it were unable to acquire a television station in Knoxville and its competitors did, the expected loss of advertising fees by petitioner would be disastrous.

The granting of television licenses is in accordance with the orders of the F.C.C. The number of television broadcasting licenses is limited, and pursuant to its authority the F.C.C. assigns specific "channels" or broadcasting frequencies to specific geographic locations. In order to get a television license from the F.C.C. certain prescribed procedures must be followed. In those cases where there are two or more applicants for the same channel a comparative hearing is held before an F.C.C. examiner. In general, the following procedures are necessary to procure a television license from the F.C.C.:

(a) An application for a construction permit is filed by each party for the desired facility. The construction permit, if granted, would permit the party to construct the desired operating facility according to prescribed F.C.C. standards.

(b) The applications are examined and the F.C.C. decides what the issues will be and sets them forth in a formal hearing order calling for a hearing before an examiner of the F.C.C. The parties may meet with the examiner for prehearing conferences. The formal hearing is then held and the parties introduce testimony and exhibits. After the record is closed, the parties file proposed findings of fact and the examiner issues an initial decision.

(c) The losing parties may file exceptions to the examiner's decision.

(d) An oral argument may then be held before the full F.C.C.

(e) The F.C.C. then issues a final decision.

(f) The losing parties may petition the F.C.C. for a rehearing.

(g) The decision of the F.C.C. is appealable to the United States Court of Appeals for the District of Columbia.

(h) Pending the issuance of a license, the F.C.C. may issue to the party having been adjudged the right to the construction permit a temporary authority to televise commercially.

(i) The party who has completed its construction then applies to the F.C.C. for a television license.

The F.C.C. assigned two channels (6 and 10) to Knoxville. In January 1951, petitioner filed an application for a television construction permit with respect to Channel 10. At this time the F.C.C. had "frozen" or suspended action on all applications for television construction permits, for the purpose of further investigating the characteristics of television with a view to modifying their plan of channel allocation. The "television freeze" was lifted in April 1952. Pursuant to F.C.C. procedure, subsequent to the lifting of the "freeze," petitioner filed a new application for television construction permit in 1952. Two other parties, Scripps-Howard Radio, Inc., and Tennessee Television, Inc., also filed applications for television construction permits with respect to Channel 10 at Knoxville. In ac-

cordance with the prescribed F.C.C. administrative procedure, petitioner and the two other applicants prepared for and prosecuted their applications before an F.C.C. examiner in a comparative hearing. Said hearing commenced in June 1953 and was concluded in April 1954. It involved about 30 days of testimony. All parties were represented by legal and engineering counsel. During 1953, petitioner incurred expenditures directly connected with said hearing in the following character and amounts:

| | |
|---|---:|
| Engineering | $2, 723. 87 |
| Legal | 25, 582. 49 |
| Exhibits | 5, 084. 79 |
| Court reporter | 575. 00 |
| Travel | 2, 704. 53 |
| Other | 400. 00 |
| Total | [1] 37, 016. 68 |

[1] This schedule was stipulated by the parties. Although the correct total of such expenses is $37,070.68, the parties apparently agree that the amount in dispute is $37,016.68.

The foregoing amount, $37,016.68, was claimed as a deduction from income on petitioner's income tax return for 1953. Respondent disallowed the deduction claimed on the ground that the amount spent constituted a capital investment. He further determined that it was spent to acquire a capital asset, a license having an indeterminate useful life beyond the taxable year and its cost could not be recovered through the annual allowance of depreciation.

On January 10, 1955, the F.C.C. examiner released his initial decision looking toward granting the application of petitioner. Subsequently exceptions were filed by both Scripps-Howard Radio, Inc., and Tennessee Television, Inc., and all parties presented oral arguments to the F.C.C. *en banc*. On January 11, 1956, the F.C.C. granted petitioner's application for a construction permit and denied the applications of the two other applicants. Tennessee Television, Inc., appealed the decision of the F.C.C. to the United States Court of Appeals for the District of Columbia. The final disposition of the action before the Court of Appeals was pending at the time of the hearing in this proceeding.

Pursuant to the F.C.C.'s granting of its application for construction permit the petitioner commenced construction of its television broadcast facility in accordance with the specifications contained in said application. On August 9, 1956, petitioner received a special temporary authorization to operate its television station on a commercial basis. Subsequently, the petitioner began broadcasting television. After petitioner began its television broadcasting, the earnings of its AM facility decreased by more than 50 per cent.

In October 1956, petitioner applied to the F.C.C. for a license to operate a television station on Channel 10, Knoxville, Tennessee. Pursuant to statutory authorization, television licenses, including renewals, are granted for 3-year periods. The F.C.C. will not grant a license upon application when the decision of the F.C.C. with respect to the construction permit is in litigation. Petitioner is entitled to operate its television station on a commercial basis pending the outcome of the litigation and during the time the F.C.C. has petitioner's application for a television license under consideration.

Applications for renewal of television licenses have been granted by the F.C.C. in the majority of cases.

Petitioner did not receive a construction permit or a license during the years in issue.

### OPINION.

The principal question to be determined herein is whether certain expenditures in the amount of $37,016.68, which were made by petitioner in 1953 for legal and engineering fees, travel, and other expenses, in connection with the preparation and conduct of hearings before the F.C.C. for the purpose of obtaining a permit to construct a television station and ultimately a license to operate such television station on Channel 10 in Knoxville, Tennessee, are deductible as ordinary and necessary business expenses under section 23(a) of the Internal Revenue Code of 1939,[1] as contended by petitioner, or constituted capital expenditures under section 24(a)(2), I. R. C. 1939,[2] as determined by respondent.

Prior to and including the taxable year petitioner operated an AM and FM radio broadcasting station in Knoxville, Tennessee. The license under which it operated as an AM station was first obtained from the F.C.C. in 1941, and the license under which it operated as an FM station was originally obtained in 1949. Both have been regularly renewed. In both instances a construction permit was obtained and the broadcasting facilities constructed and installed before the licenses to operate were granted by the F.C.C. In 1951 petitioner filed an application with the F.C.C. for a permit to construct a television station to operate on Channel 10, Knoxville, Tenn-

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) IN GENERAL.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

[2] SEC. 24. ITEMS NOT DEDUCTIBLE.

(a) GENERAL RULE.—In computing net income no deduction shall in any case be allowed in respect of—

* * * * * * *

(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, except expenditures for the development of mines or deposits deductible under section 23 (cc) ;

essee. The F.C.C. "froze" or suspended action on all applications for television construction permits pending a reallocation of television channels until April 1952. After the "freeze" was lifted petitioner filed a new or amended application for a television construction permit. Two other parties also filed applications for television construction permits with respect to Channel 10 in Knoxville. In accordance with F.C.C. procedure, a comparative hearing on the applications of petitioner and the other two applicants was held before an F.C.C. examiner during the period June 1953 to April 1954. The expenditures involved herein were incurred by petitioner during 1953 in connection with the preparation and conduct of such hearing. An initial decision favoring the granting of the application of petitioner was released by the F.C.C. examiner on January 10, 1955. Thereafter exceptions were filed by the other two parties and oral arguments presented to the F.C.C. *en banc*. On January 11, 1956, the F.C.C. granted petitioner's application for a construction permit and denied the applications of the other two applicants. Tennessee Television, Inc., one of the losing applicants, appealed the decision of the F.C.C. to the United States Court of Appeals for the District of Columbia, where the matter was still pending at the time of the hearing in this proceeding. Following the granting of its application for a construction permit by the F.C.C., petitioner began construction of its television broadcasting facility and, on August 9, 1956, received a special temporary authorization to operate its television station on a commercial basis. In October 1956, petitioner filed an application with the F.C.C. for a license to operate its television station on Channel 10 in Knoxville, Tennessee. This application had not been acted upon as of the date of the hearing herein in accordance with the policy of the F.C.C. not to grant a license while litigation with respect to the prerequisite construction permit is pending.

Petitioner's position, simply stated, appears to be[3] that, since it has been engaged in the business of operating an AM radio broadcasting station for a number of years, the expenses incurred for the purpose of obtaining a permit to construct a television broadcasting station are related to the business in which it is engaged and accordingly deductible as ordinary and necessary business expenses under the provisions of section 23(a). It further argues, apparently in answer to respondent's determination that the expenditures involved were incurred in support of petitioner's "application for a license" to broadcast on TV Channel 10, and constituted a capital investment:

[3] Petitioner's brief contains no clear and concise "statement of points" upon which it relies, as required by Rule 35 of the Rules of Practice of this Court, and we have experienced considerable difficulty in attempting to extract its contentions from the involved and unorganized admixture of arguments, testimony, and alleged factual premises.

(1) That the expenditures in 1953 were made in support of an application for a construction permit and not a television license, since the application for a television license was not filed until 1956; (2) that such expenditures were in defense of its existing AM investment; and (3) that it received nothing of value in 1953 which could be considered a capital asset, since the construction permit was not received until 1956, and, is still in litigation.

Respondent does not question the reasonableness of the amounts expended nor that they were ordinary and necessary in the sense that applicants before the F.C.C. usually incur such expenses and that they were necessary in the presentation of its application. It is his position, however, that notwithstanding they were ordinary and necessary, since the purpose of the expenditures was to acquire a television license which is a capital asset having a life in excess of 1 year, such expenditures are not deductible as business expenses but are to be capitalized.

So far as we are aware, there have been no previous court decisions dealing with the question whether expenditures incurred in connection with the procurement of a television construction permit or license are to be expensed or capitalized. Respondent's position with respect to expenses of this nature has, however, been the subject of a revenue ruling under section 263 of the 1954 Code which is set forth in the margin.[4]

Before discussing the nature of the expenditures, we think it important to point out that we do not agree with the initial position taken by petitioner, that is, that the expenses incurred for the purpose of obtaining a television construction permit were so related to the business in which petitioner was then engaged as to make them deductible as ordinary and necessary expenses of that business. What constitutes the "carrying on" of a "trade or business" for the purpose

---

[4] SECTION 263.—CAPITAL EXPENDITURES.

* * *

Rev. Rul. 56–520

A corporation that operates a radio broadcasting station made expenditures during the course of and with respect to a contest, before the Federal Communications Commission, to determine whether it should be awarded permission to use a certain channel in connection with its proposal to operate a television broadcasting station. The expenditures consisted of legal, engineering and accounting fees, travel expenses of witnesses for hearings, and other expenses incident to the preparation of briefs for trial. Permission to use a television channel is renewable periodically by the Federal Communications Commission. *Held,* if the expenditures result in obtaining permission to use the television facility, (1) the amounts thereof would not be deductible from gross income, but would constitute a part of the cost basis of an asset of a permanent nature, within the meaning of section 263 of the Internal Revenue Code of 1954; (2) since the useful life of the asset is of an indeterminate duration, a deduction for depreciation thereon is not allowable; and (3) the cost basis of such asset would be recoverable upon its sale or other disposition. Compare *Morris Nachman et al.* v. *Commissioner,* 191 Fed. (2d) 934; also *Coca-Cola Bottling Co.* v. *Commissioner,* 6 B.T.A. 1333, in which it was held that no allowance can be made for the exhaustion of the cost of a contract granting a perpetual privilege to bottle Coca-Cola. *Held further,* if the corporation is unsuccessful in obtaining permission to use the television facility, the expenditures constitute a loss which is deductible from gross income in the year in which permission is finally denied. Compare *Champlain Coach Lines, Inc.* v. *Commissioner,* 138 Fed. (2d) 904. [1956–2 C.B. 170]

of determining the deductibility of claimed business expenses, is dependent upon the examination of all the facts and activities of the taxpayer in each case. Cf. *George C. Westervelt*, 8 T.C. 1248; *Frank B. Polachek*, 22 T.C. 858; *Henry G. Owen*, 23 T.C. 377.

We do not question that the operation of AM (amplitude modulation) and FM (frequency modulation) radio stations and TV or television stations are related businesses in the sense that each is engaged in broadcasting, or transmitting messages or signals over the air waves by means of electrical impulses and are commonly referred to as the broadcasting industry. Though segments of the same general industry they are nevertheless distinct businesses and are so recognized by the Government and industry as evidenced by the fact that they are required to obtain a license for each separate operation and each operation may be engaged in without engaging in the others.

Prior to the taxable year petitioner was engaged in the operation of an AM and an FM radio station. It was not engaged in the operation of a TV or television station and had no facilities for such an operation. Consequently the expenses incurred in 1953 for the purpose of acquiring a television construction permit and eventually a television license were not paid or incurred "in carrying on" a "trade or business" in which petitioner was then engaged so as to make such expenditures deductible as ordinary and necessary business expenses within the meaning of section 23 (a). This conclusion applies whether the expenditures were incurred in support of an application for a television construction permit or a television license. We might add, however, that we do not understand petitioner seriously to contend that in applying for a television construction permit it was not in substance and effect seeking a television license. See *Ashbacker Radio Co.* v. *F.C.C.*, 326 U.S., 327, 328, footnote 1; *Goss* v. *Federal Radio Commission*, (App. D.C.) 67 F. 2d 507. As petitioner has recognized in its reply brief, a construction permit without a license, should the holder of the construction permit fail to receive a license, would result in great financial loss and it is reasonable to assume that petitioner would not have applied for a construction permit without the hope and expectation of receiving a license to operate the station after it had been constructed.

Granting petitioner's premise, however, that the expenditures involved were ordinary and necessary and were related to its broadcasting business, it does not necessarily follow that they are deductible as business expenses if, as here appears, they were incurred for the purpose of acquiring a capital asset or a like advantage, having a useful life in excess of 1 year. *American Envelope Co.*, 29 T.C. 307; *United States* v. *Akin*, 248 F. 2d 742, certiorari denied 355 U.S. 956. As was pointed out in the *Akin* case, *supra:*

It is not always easy to find a verbal formula which readily supplies an unerring guide in drawing the boundary line between current expenses and capital outlays. But it may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year.

The decisive test is the character of the transaction which gave rise to the payment. *American Envelope Co., supra; Colony Coal & Coke Corporation*, 20 B.T.A. 326, affd. 52 F. 2d 923; *Hales-Mullaly, Inc.* v. *Commissioner*, 131 F. 2d 509; *Mt. Morris Drive-In Theatre Co.*, 25 T.C. 272, affirmed per curiam 238 F. 2d 85.

It is undisputed that during the years involved television licenses were granted for 3-year periods. (47 U.S.C. sec. 307.) It is also clear that a television license is a capital asset of value in the holder's business and in the production of income. The number of television licenses available in any given area is limited to the number of channels allocated by the F.C.C. to such area. When granted, a television license gives to the holder thereof the exclusive privilege of telecasting over the particular channel designated in the license. Not only is it a source of income to the holder while operating thereunder, but it also enhances the sale value of the television station, since, though a licensee obtains no vested interest in any frequency by reason of the granting of a television license, *Ashbacker Radio Co.* v. *F.C.C.*, *supra*, and though not a property right independently transferrable, *Commission* v. *Sanders Radio Station*, 309 U.S. 470, the F.C.C. will generally allow the transfer of a television license upon the sale of the television station. Petitioner does not dispute that an existing television license is an asset of value, the amount of which is usually included in the purchase price upon the sale of the operating station and is to be capitalized. Petitioner argues, however, that the amount here in issue cannot be considered as an expenditure in the acquisition of a capital asset because during the year 1953 nothing was acquired nor was there any assurance that anything would be acquired. It points out that the television construction permit was not granted until 1956 and that as of the time of the hearing in this proceeding it had not received a television license because of the unresolved litigation concerning the construction permit. Therefore petitioner argues that during 1953 it had received nothing for the expenditures involved which could properly be entered on its books as a capital asset. In effect, petitioner takes the position that until the license is finally and completely granted, and has proven itself to be of economic benefit, expenditures made for the purpose of acquiring the license may not be capitalized but are to be deducted as ordinary and necessary business expenses. Otherwise, it argues, the legal status of the expenditure may be

suspended for a number of years. We do not agree. Petitioner has referred us to no authorities supporting its position and we are aware of none. The expenditures involved were all made for the purpose of acquiring a capital asset having a useful life in excess of 1 year and consequently were capital expenditures. The fact that petitioner may not be successful in its efforts to acquire the television license for Channel 10, Knoxville, Tennessee, is not sufficient to change the character of such expenditures or to constitute them ordinary and necessary business expenses. As was stated in *Connally Realty Co.*, 31 B.T.A. 349, affd. 81 F. 2d 221, at page 350:

the character of a capital expenditure is not lost because it proves unfortunate. An unsuccessful investment may involve a loss, but it does not thereby become an expense; and as a loss it is only recognized when it is definitively realized.

Nor is the fact that amortization of the costs of acquiring a television license may be delayed until the license has been granted sufficient to constitute the expenditures business expenses. Experience teaches us that it is not an uncommon accounting practice to charge certain payments to appropriately described deferred or suspense accounts pending completion of a transaction or final determination of its status.

Petitioner also argues that the primary reason for the expenditures in question was to protect its position as a broadcaster and its investment in its radio station and therefore such expenditures constituted ordinary and necessary business expenses. In this connection it says that if another applicant should receive the license to televise over Channel 10 in Knoxville the loss of revenue caused by advertisers switching from radio to television advertising would seriously damage or destroy its business. While petitioner's fear of a loss in revenue from its radio facility resulting from the competition of television was undoubtedly well founded, it is not determinative of the present question and the petitioner has failed to demonstrate how such revenue would be protected if it, instead of one of the other applicants, obtained the television license. In fact the record shows that petitioner's revenue from the radio station has decreased approximately 50 per cent notwithstanding petitioner has been operating its television station, under special temporary authorization pending disposition of the litigation concerning the construction permit, since August 9, 1956. The record clearly indicates that petitioner's principal reason in applying for a television construction permit and incurring the expenditures involved was to enable it to enter into a new and improved field of broadcasting and to secure for itself the economic benefits expected to be derived from such an operation. By so doing it would prevent someone else from obtaining such benefits. True, it hoped to retain old clients and to obtain new ones. Obviously, however, old clients who switched to television as a means of adver-

tising as well as new ones who subscribed for such service would represent business of the television station and not of the radio station. If considered as having been expended to eliminate competition, the expenditures were nevertheless capital in nature. *Dane County Title Co.*, 29 T.C. 625.

*Commissioner* v. *Heininger*, 320 U.S. 467, and *All States Freight, Inc.* v. *United States*, 72 F. Supp. 673, cited by petitioner, are clearly distinguishable and do not support petitioner's contentions. In the *Heininger* case, the taxpayer's mail order business was threatened with destruction by a fraud order issued by postal authorities denying him the use of the mails. The legal fees involved were incurred to protect an existing and not a new business or the extension of an old one. In the *All States* case, the taxpayer was a common carrier conducting a trucking business over established routes, including interstate, and had been so engaged prior to the time it was required to obtain a certificate of public convenience and necessity from the Interstate Commerce Commission. The expenditures for which deduction was sought were therefore, as held by the court, incurred in defending its right to continue in the same business it had previously been engaged in and did not constitute an investment in new property.

There is even less merit in petitioner's argument that the expenditures involved were business expenses because they resulted from the filing of opposing applications which compelled resort to litigation, hence were of a defensive nature. Such argument necessarily presumes that petitioner had an unqualified right to Channel 10, Knoxville, Tennessee, and that the other two applicants were intervenors who did not possess the same right to apply for such channel as petitioner did. Prior to the Federal Communications Commission's decision awarding the construction permit to petitioner, however, petitioner had no more right to Channel 10 than either of the other applicants, one of which, like petitioner, was then engaged in radio broadcasting and the other was a group of business men desiring to enter into the television broadcasting business.

This Court has consistently held that the costs of acquiring licenses and franchises having useful lives in excess of 1 year are not deductible as business expenses but should be treated as capital expenditures. *Morris Nachman*, 12 T.C. 1204, affd. 191 F. 2d 934; *Tube Bar, Inc.*, 15 T.C. 922; *Pasadena City Lines, Inc.*, 23 T.C. 34; *Vermont Transit Co.*, 19 T.C. 1040, affd. 218 F. 2d 468, certiorari denied 349 U.S. 945. We think the facts and circumstances of the instant case require a similar conclusion, notwithstanding the license here sought had not, as of the date of the hearing, as yet been granted. As pointed out above, the character of the capital expendi-

tures will not be changed even if petitioner is ultimately unsuccessful in obtaining the license. In the latter event petitioner may suffer a loss, which, however, may only be recognized when definitely realized. *Connally Realty Co., supra.*

For the several reasons discussed above, we hold that the expenditures involved are not deductible as ordinary and necessary business expenses and respondent did not err in disallowing the claimed deduction.

Petitioner contends, in the alternative, that if it should be held that the expenditures in issue should be capitalized, "they should be depreciated over the normal three-year life of a television license." Respondent argues, however, that a television license granted by the F.C.C. is an intangible asset having an indeterminable useful life and is therefore not subject to depreciation.

The television license for which the expenditures were made was not in existence in 1953 and had not as yet been granted by the F.C.C. when this case was heard in 1958, due to the pendency of the litigation respecting the construction permit. Under the circumstances, any claim by the petitioner for amortization of the cost of acquiring a television license is premature and it is unnecessary for us to determine whether the useful life of a television license, for depreciation purposes, is limited to the 3-year period contended for by petitioner or is indeterminable as argued by respondent. In any event it is clear that petitioner is not entitled to any deduction in 1953 for amortization of the costs of acquiring a television license.

The last issue for decision involves the respondent's partial disallowance of depreciation expenses claimed by petitioner for each of the years in issue with respect to its FM radio equipment. The only question presented is whether the allowable depreciation expense of such equipment should be computed over a 5-year useful life as contended by petitioner or a 10-year useful life as determined by respondent.

The parties apparently agree that 10 years is a normal life period for FM facilities insofar as their physical characteristics are concerned. When petitioner first acquired its FM facilities in 1948, it computed its depreciation allowance with respect thereto on the basis of a 10-year useful life. Petitioner's position is that because of a combination of factors, including the advent of television and lack of public interest in FM, it became apparent to petitioner in 1952 that its FM facility was economically unproductive and therefore obsolete. Accordingly, it revised its depreciation schedule with respect to its FM equipment and computed its depreciation allowance with respect thereto on the basis of a 5-year useful life to take into account such "extraordinary obsolescence."

Section 23(1), I.R.C. 1939,[5] provides a reasonable allowance for obsolescence as a part of the deduction for depreciation. Regulations 118, section 39.23(1)–6, provide as follows:

*Obsolescence.* With respect to physical property the whole or any portion of which is clearly shown by the taxpayer as being affected by economic conditions that will result in its being abandoned at a future date prior to the end of its normal useful life, so that depreciation deductions alone are insufficient to return the cost or other basis at the end of its economic term of usefulness, a reasonable deduction for obsolescence, in addition to depreciation, may be allowed in accordance with the facts obtaining with respect to each item of property concerning which a claim for obsolescence is made. No deduction for obsolescence will be permitted merely because, in the opinion of a taxpayer, the property may become obsolete at some later date. * * *

Whether property belonging to the taxpayer has sustained obsolescence is a question of fact to be determined from the evidence in each case. *Conley Tin Foil Corporation,* 17 B.T.A. 65. The burden is upon the taxpayer to furnish evidence that the useful life of the property has been shortened by obsolescence and that its costs will not be recovered by the deduction for depreciation for ordinary wear and tear before its usefulness is at an end. *Giles E. Bullock,* 26 T.C. 276, affirmed per curiam 253 F. 2d 715; *Southeastern Building Corporation,* 3 T.C. 381, affd. 148 F. 2d 879, certiorari denied 326 U.S. 740. Mere diminution in value of the assets resulting from competition will not sustain a deduction on account of obsolescence where the assets are still in use and there is no contemplated abandonment. *Detroit & Windsor Ferry Co.* v. *Woodworth,* 115 F. 2d 795, certiorari denied 312 U.S. 692; cf. *Rodeo-Vallejo Ferry Co.,* 24 B.T.A. 936.

In the instant case the petitioner makes no contention that there is or has been any intention by it to abandon its FM facility. To the contrary, the record establishes that it has used its FM equipment since its acquisition in 1948 and 1949 and that it intends to continue doing so. We regard such factors as inconsistent with a claim that petitioner is entitled to a deduction for obsolescence. *Detroit & Windsor Ferry Co.* v. *Woodworth, supra.* In this circumstance there has been no showing by petitioner that during the years in issue the FM facilities were being affected by economic conditions that would result in their being abandoned at a future date prior to the end of their normal useful life and before their cost basis had been recovered by normal depreciation deductions alone. Regs. 118, sec. 39.23(1)–6;

---

[5] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

* * * * * * *

(1) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, * * *

*Giles E. Bullock, supra.*[6]  Petitioner has failed to demonstrate its right to the claimed deduction.   Accordingly, we sustain respondent's determination.   In order that the parties may compute the proper amount of allowable depreciation in accordance with paragraph 6 of the stipulation and Exhibit I attached thereto,

*Decision will be entered under Rule 50.*

---

[6] See also *Real Estate Land Title & Trust Co.* v. *United States,* 309 U.S. 13, wherein the Supreme Court cited with approval Regulations 74, Art. 206, which in pertinent part is identical with the regulations here applicable.